

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE KENDALL

| | |
|---|---|
| UNITED STATES OF AMERICA | ) No. 14 CR 135     **MAGISTRATE JUDGE VALDEZ** |
| | ) |
| v. | ) Violations: Title 18, United States |
| | ) Code, Sections 371, 666, 1341, 1343, |
| JOHN BILLS, | ) 1346, and 1951; Title 26, United States |
| MARTIN O'MALLEY, and | ) Code, Section 7206(1) |
| KAREN FINLEY | ) |
| | ) **INDICTMENT** |

**COUNT ONE**

**F I L E D**

The SPECIAL MARCH 2013 GRAND JURY charges:

AUG 1 3 2014

1. At times material to this indictment:

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

### Relevant Entities and Individuals

a. The City of Chicago was a local government located in the Northern District of Illinois. The City received in excess of $10,000 in federal funding for each calendar year 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010 and 2011.

b. Defendant JOHN BILLS was an employee of the City of Chicago from June 1979, until he retired on June 30, 2011. BILLS' job title at the time he retired was Managing Deputy Commissioner with the City's Department of Transportation, also known as CDOT. BILLS was an agent of the City during the entirety of his employment with the City. BILLS, in his capacity as an employee of the City, owed a duty of honest services to the City and the people of the City in the performance of his public duties.

c.    Redflex Traffic Systems, Inc. (Redflex) developed and manufactured digital photo enforcement systems including red light cameras.

d.    Prior to the summer of 2003, Martin O'Malley was a friend of defendant JOHN BILLS. From approximately November 2003 to approximately November 2012, O'Malley was an independent contractor for Redflex.

e.    From approximately 2001 until late 2005, defendant KAREN FINLEY was the Vice President of Operations of Redflex. From late 2005 through February 2013, FINLEY was the Chief Executive Officer of Redflex.

f.    Individual A was Vice President of Sales and Marketing for Redflex.

g.    From approximately 2001 until late 2005, Individual B was the Chief Executive Officer of Redflex.

h.    Nonprofit Corporation A was engaged in advocacy and education efforts in Illinois and elsewhere.

### The Red Light Program

i.    In or about October 2003, the City of Chicago signed a contract (PO 3220) with Redflex for the installation, maintenance and operation of the City's first Digital Automated Red Light Enforcement Program, also known as DARLEP. DARLEP used cameras to automatically record and ticket drivers who ran red lights.

j.    PO 3220 was expanded at least three times before ending in October 2008. From 2004 to 2008, the City paid Redflex approximately $25 million

pursuant to PO 3220. In return, Redflex installed cameras in Chicago intersections, maintained the cameras, and assisted in the review and processing of the violations.

k. Redflex was awarded PO 3220 through a City-run Request for Proposal process, also known as an RFP. Redflex and another competitor were the two finalists, and Redflex was awarded the contract following an approximately one-month long trial phase of the competing systems.

l. The City awarded Redflex a new contract, PO 18031, with a start date of on or about February 1, 2008, for the operation and maintenance of the camera systems already installed under PO 3220. PO 18031 was "sole-sourced," meaning that it was awarded to Redflex without a competitive procurement process.

m. On or about February 21, 2008, following an RFP process, the City awarded DARLEP Contract PO 16396 to Redflex. Contract PO 16396 was essentially the same as the original DARLEP contract to install, operate, and maintain red light cameras.

n. Defendant BILLS managed the City's DARLEP program from the time the RFP for PO 3220 was initiated in late 2002 until he retired in 2011. Defendant BILLS served as a voting member on the 2003 DARLEP RFP evaluation committee and served as an advisory, non-voting member on the 2007 DARLEP RFP evaluation committee.

## The Scheme to Defraud

2.     Beginning in or about approximately late 2002 and continuing until at least in or about late 2012, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, as well as Martin O'Malley, Individual A, and others known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme to defraud the City of Chicago of money, property, and the intangible right to the honest services of defendant BILLS by means of materially false and fraudulent pretenses, representations, promises, and the concealment of material facts, which scheme is further described in the following paragraphs:

3.     It was part of the scheme to defraud that, in exchange for defendant JOHN BILLS' efforts, as manager of the City's DARLEP, to assist Redflex in obtaining, keeping, and growing its DARLEP contracts with the City, including his providing inside information, Redflex officials, including Individual A and defendant KAREN FINLEY, provided BILLS with personal financial benefits, including meals, hotel stays, rental cars, and golf outings, and, in addition, arranged for Martin O'Malley to be hired as an independent contractor for Redflex and to receive lucrative compensation, much of which O'Malley passed on to BILLS.

## Events Surrounding the 2003 DARLEP Contract

4.     It was further part of the scheme that after Individual A gave a presentation to defendant BILLS regarding Redflex's red light camera systems in or

4

about late 2002, and shortly after Individual A attended a pre-bid meeting at CDOT for vendors interested in the City's DARLEP RFP on January 3, 2003, BILLS contacted Individual A and asked Individual A to get him a hotel room in Los Angeles. Individual A paid for a hotel room for BILLS and sought and received from Redflex reimbursement for the hotel room.

5. It was further part of the scheme that in or about February 2003, after Redflex was selected, along with a competitor, to be part of a pilot phase, in which the two vendors competed for the City of Chicago's red light camera contract, defendant FINLEY, Individual A, and others from Redflex met defendant BILLS at the John Hancock Center, and BILLS provided information in an effort to give Redflex an advantage over its competitor in the pilot phase.

6. It was further part of the scheme that during the time period of the pilot phase, defendant BILLS indicated to Individual A that BILLS could get Redflex the contract not only by voting for Redflex himself, but also by influencing fellow DARLEP committee members to vote for Redflex.

7. It was further part of the scheme that prior to the start of the pilot phase, defendant BILLS recommended that Redflex hire Company A, which was owned by Subcontractor A, as a subcontractor, and Redflex hired Company A in order to ensure that BILLS supported Redflex in its efforts to be awarded the City of Chicago contract.

8. It was further part of the scheme that in or about May 2003, Redflex officials, including Individuals A and B, met with defendant BILLS outside of his

5

City office in order to make BILLS a "Redflex expert" so that he could convince the City's evaluation committee to recommend that Redflex be awarded the contract.

9. It was further part of the scheme that days prior to a meeting on May 27, 2003, when the DARLEP RFP evaluation committee was to meet and recommend a winner of the pilot phase, defendant BILLS took Individual A and Subcontractor A to the CDOT office after hours, where BILLS and Individual A reviewed red light photographs taken during the pilot phase by Redflex and its competitor and selected photographs that showed Redflex cameras working well, and the competitor's cameras working poorly. BILLS said that he planned to show the selected photographs the next day during the evaluation committee's meeting, and would pretend that the photographs were chosen randomly.

10. It was further part of the scheme that, while in the CDOT office after hours, defendant BILLS wrote out name placards for each member of the committee and arranged the seating in a particular way to control the voting order so that committee members BILLS knew would support Redflex would vote first, and these votes would influence the members who would vote later in the process.

11. It was further part of the scheme that in or about June 2003, on a night when defendant BILLS, Subcontractor A, and Redflex officials had dinner in Los Angeles to celebrate the RFP evaluation committee's unanimous recommendation that Redflex be awarded the DARLEP contract and the CDOT Commissioner's concurrence with the recommendation, BILLS told Individual A words to the effect of, "It's time to make good," which Individual A understood to

mean that BILLS wanted and expected to be paid for helping Redflex win, maintain and grow the Chicago DARLEP contract. BILLS discussed how much money he wanted and said the proposed amounts were based on the size of the contract. BILLS suggested to Individual A ways by which Redflex could make payments to BILLS, including the suggestion that Redflex could pay BILLS through Redflex's newly created Chicago customer liaison position.

12. It was further part of the scheme that Individual A relayed to defendant FINLEY and Individual B this demand from defendant BILLS.

13. It was further part of the scheme that in or about May 2003, defendant FINLEY directed that an advertisement be placed in a Chicago newspaper seeking an Account Manager for Redflex's City of Chicago contract, and defendant BILLS told O'Malley to look for and respond to the advertisement.

14. It was further part of the scheme that after O'Malley interviewed with defendant FINLEY and Individual B for the position of Account Manager in July 2003, he was offered the position, and between approximately August and November 2003, defendant BILLS indicated to O'Malley that BILLS was working with Redflex on O'Malley's employment contract.

15. It was further part of the scheme that during the period that defendant BILLS indicated to O'Malley that he was working with Redflex on the O'Malley contract, BILLS informed O'Malley that O'Malley would give BILLS a portion of the commissions that O'Malley was to receive under the O'Malley contract.

16. It was further part of the scheme that at about the time that Redflex was negotiating the O'Malley contract, Redflex was also in negotiations with the City Procurement Department regarding the terms of the DARLEP contract, and in or about October 2003, defendant BILLS assisted in causing Redflex's DARLEP contract to contain a provision limiting liquidated damages, which limited Redflex's financial liabilities in potential lawsuits with the City of Chicago related to the contract, which was an advantage to Redflex and, as BILLS knew, was against the advice of the City of Chicago's Law Department.

17. It was further part of the scheme that in or about late November and early December 2003, defendant FINLEY and Individual B, on behalf of Redflex, completed negotiations on the O'Malley contract, which was finalized and backdated to an effective date of November 3, 2003. Under the terms of the O'Malley contract, Redflex paid O'Malley a regular salary of $2,300 twice a month (which was increased to $2,500 in 2007), a $5,000 bonus every six months, as well as commissions. The O'Malley contract was written such that the bulk of its value was generated from commissions O'Malley would receive on red light camera installations and also on what was referred to as "out-of-scope" work, which included an increase in the fee Redflex charged the City for the maintenance of the cameras.

### Events Surrounding the 2008 DARLEP Contracts

18. It was further part of the scheme that in or about 2007, when Redflex was trying to win two red light camera contracts with the City of Chicago (one for

maintenance of previously installed camera systems and the other for the installation of additional camera systems), defendant BILLS, through O'Malley, gave defendant FINLEY and Individual A the opportunity to draft documents that BILLS was to use to advantage Redflex in obtaining the contracts.

19. It was further part of the scheme that, in an e-mail exchange with Individual A regarding the drafting of documents that would give Redflex an advantage in obtaining the contracts, defendant FINLEY admonished Individual A that Individual A's discussions with O'Malley about the drafts should not be in writing and advised that FINLEY was deleting her e-mails regarding the drafts as she was sending them.

20. It was further part of the scheme that when, prior to the awarding of the two red light camera contracts, employees of Redflex raised questions regarding the O'Malley contract and the significant increase in payments to O'Malley that the O'Malley contract appeared to require, defendant FINLEY did not agree to renegotiate or clarify the O'Malley contract but instead stated that the O'Malley contract would remain "parked for now."

21. It was further part of the scheme that in or about 2007, prior to the two red light camera contracts being awarded to Redflex, defendant BILLS told Individual A that BILLS could still direct the vote of the evaluation committee, even though he was no longer a voting member.

22. It was further part of the scheme that on or about August 17, 2007, as part of the application process for PO 16396, and on or about September 23, 2008,

9

as part of the contract process for PO 18031, defendant KAREN FINLEY falsely certified on Economic Disclosure Statements that no agents of Redflex, during the prior five years, had bribed or attempted to bribe an employee of the City of Chicago, and further falsely certified that Redflex would comply with the Governmental Ethics Ordinance of the City. The Governmental Ethics Ordinance prohibited any person from giving any City official anything of value based on the mutual understanding that the official's actions, decisions, or judgments concerning the business of the City would be influenced thereby, and also prohibited any City official or employee from soliciting or accepting anything of value in return for advice or assistance on matters concerning the operation or business of the City.

### Payments From Redflex to O'Malley

23. It was further part of the scheme that from 2003 to 2011, pursuant to the O'Malley contract, O'Malley was paid over $2 million. From late 2003 through 2006, Redflex paid O'Malley approximately $175,000 in salary payments (approximately $60,000 per year), $35,000 in reimbursed expenses, and $85,000 in bonuses and commissions. Between 2007 and 2011, Redflex paid O'Malley approximately $290,000 in salary payments (in mid-2007, at the request of O'Malley, Redflex increased O'Malley's salary from $2,300 to $2,500 twice a month), $12,000 in reimbursed expenses, and the following in bonuses and commissions: $87,400 (2007), $342,026 (2008), $515,046 (2009), $193,205 (2010), and $289,757 (2011).

24. It was further part of the scheme that at various times, when employees of Redflex questioned the large amounts of commissions paid to O'Malley, Individual A and defendant FINLEY avoided any discussion and indicated that matters relating to the Chicago contracts, including O'Malley's compensation, would be handled by Individual A and FINLEY.

### O'Malley's Funneling Redflex Funds to Defendant BILLS

25. It was further part of the scheme that from late 2003 through November 2012, O'Malley and defendant BILLS utilized several methods by which O'Malley transferred funds from Redflex to BILLS.

26. It was further part of the scheme that from 2004 through 2012, O'Malley withdrew over $600,000 in cash, and, at defendant BILLS' direction, O'Malley paid BILLS approximately $570,000 in cash.

27. It was further part of the scheme that from 2006 through 2011, defendant BILLS, his then-wife, and his then-girlfriend used at least $80,000 in cash to pay for personal expenses.

28. It was further part of the scheme that from 2008 to 2010, at defendant BILLS' direction, O'Malley wrote BILLS approximately $17,900 worth of checks, which BILLS used to pay certain personal debts and expenses.

29. It was further part of the scheme that from 2007 to 2011, at defendant BILLS' direction, O'Malley wrote approximately $5,500 worth of checks to a political organization.

30. It was further part of the scheme that in or about May 2008, at defendant BILLS' direction, O'Malley purchased a condominium in Arizona for the use of BILLS and BILLS' family and friends. O'Malley used approximately $76,000 in funds that he received from Redflex for the down payment and financed the remainder by means of a mortgage, which he serviced using funds he received from Redflex. O'Malley paid the utilities, association fees, insurance, and other costs associated with the condominium with funds he received from Redflex.

31. It was further part of the scheme that defendant BILLS made use of the condominium with his family and friends, indicating that the condominium was his, until approximately the fall of 2012, when BILLS' relationship with Redflex was questioned in the Chicago media.

**Defendant BILLS' Requests for Other Financial Benefits**

32. It was further part of the scheme that from 2003 through 2011, at defendant BILLS' request, Individual A paid for numerous items for BILLS, including hotel rooms, car rentals, meals, golf games, computers, and other personal items and, with the approval of defendant FINLEY and Individual B, expensed these purchases through Redflex. Most of the expenses were the result of requests made directly by BILLS to Individual A, although occasionally, the requests came through O'Malley, for the benefit of BILLS. Individual A and others at Redflex expensed at least $20,000 of personal items for BILLS in exchange for BILLS using his position with the City of Chicago to make sure that Redflex kept and expanded

its 2003 contract with the City of Chicago and obtained additional contracts with the City in the future, including the 2008 DARLEP contracts.

33. It was further part of the scheme that, in the Statements of Financial Interests that defendant BILLS filed with the City of Chicago Board of Ethics each year from 2005 through 2011, in response to Question 6, entitled "Interest in City Business," BILLS falsely denied having a financial interest in any person doing business with the City, and, in response to Question 10, entitled "Gifts and Honoraria," BILLS failed to report receiving from Redflex, Redflex employees, or Martin O'Malley, any gifts having an aggregate value in excess of $500.

### Defendant BILLS Retires from the City

34. It was further part of the scheme that prior to defendant BILLS' retirement from the City of Chicago on June 30, 2011, BILLS made it known to Individual A and other Redflex employees that he wanted a job with Redflex.

35. It was further part of the scheme that defendant FINLEY and Individual A, along with others from Redflex, arranged for defendant BILLS to get a job with Nonprofit Corporation A, which was funded by Redflex. Once Nonprofit Corporation A hired BILLS, Redflex increased its monthly contribution to Nonprofit Corporation A to help pay for BILLS' salary.

36. It was further part of the scheme that after defendant BILLS received a job with Nonprofit Corporation A, defendant FINLEY and others from Redflex did not want to "double pay" defendant BILLS, and as such, eventually Redflex stopped paying O'Malley commissions.

37. It was further part of the scheme that, in or about the early spring of 2012, after Nonprofit Corporation A terminated defendant BILLS, he then continued to suggest to Redflex officials, including Individual A, alternative ways by which Redflex could compensate him for his assistance, including hiring his then-girlfriend.

38. It was further part of the scheme that Martin O'Malley, Individual A, and defendants JOHN BILLS and KAREN FINLEY concealed, misrepresented and hid, and caused to be concealed, misrepresented and hidden, the existence and purpose of the scheme, and acts done in furtherance of the scheme.

39. On or about October 8, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $89,799.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

14

## COUNT TWO

The SPECIAL MARCH 2013 GRAND JURY further charges:

40.    Paragraphs 1-38 of Count One are incorporated here.

41.    On or about December 17, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $73,264.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

## COUNT THREE

The SPECIAL MARCH 2013 GRAND JURY further charges:

1. Paragraphs 1-38 of Count One are incorporated here.

2. On or about January 25, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $75,442.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

16

## COUNT FOUR

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1-38 of Count One are incorporated here.

2.      On or about February 19, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $38,315.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

## COUNT FIVE

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1-38 of Count One are incorporated here.

2.     On or about June 23, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $74,448.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

18

## COUNT SIX

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.    Paragraphs 1-38 of Count One are incorporated here.

2.    On or about January 19, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $103,438.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

19

## COUNT SEVEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1-38 of Count One are incorporated here.

2.     On or about April 20, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $57,024.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

20

ow

## COUNT EIGHT

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraphs 1-38 of Count One are incorporated here.

2.     On or about May 23, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $38,016.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

22

## COUNT NINE

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1-37 of Count One are incorporated here.

2.      On or about June 27, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be delivered by United States Mail according to the direction thereon, an envelope from Redflex Traffic Systems in Scottsdale, Arizona, to Martin O'Malley, at a lockbox located at 3400 W. 111th Street #159, Chicago, IL, 60655, which contained a check to Martin O'Malley in the amount of $19,008.00;

In violation of Title 18, United States Code, Sections 1341 and 1346.

## COUNT TEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1-38 of Count One are incorporated here.

2.      In or about September 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signals, and sounds, namely a transfer of funds in the amount of $5,511.02, which contained reimbursement by Redflex for a personal benefit for defendant BILLS in the amount of $3,051.26, from Redflex Traffic Systems' bank account in Minnesota to Employee A, through a JP Morgan bank account in Florida;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT ELEVEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraphs 1-38 of Count One are incorporated here.

2.      In or about December 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signals, and sounds, namely a transfer of funds in the amount of $4,205.74, which contained reimbursement by Redflex for a personal benefit for defendant BILLS in the amount of $1,542.02, from Redflex Traffic Systems' bank account in Minnesota to Employee A, through a JP Morgan bank account in Florida;

In violation of Title 18, United States Code, Sections 1343 and 1346.

24

## COUNT TWELVE

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.    Paragraphs 1-38 of Count One are incorporated here.

2.    In or about March 2010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS and
KAREN FINLEY,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signals, and sounds, namely a transfer of funds in the amount of $7,442.14, which contained reimbursement by Redflex for a personal benefit for defendant BILLS in the amount of $5,488.38, from Redflex Traffic Systems' bank account in Minnesota to Employee B, through a Bank of America bank account in Virginia;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT THIRTEEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1 of Count One is incorporated here.

2.      Beginning in at least January 2003 and continuing through on or about June 30, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS,

defendant herein, did commit extortion, which extortion affected commerce, in that the defendant obtained property, in the form of cash payments and other financial benefits from Redflex Traffic Systems, with the consent of agents and officers of Redflex, under color of official right;

In violation of Title 18, United States Code, Section 1951(a).

## COUNT FOURTEEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraph 1 of Count One is incorporated here.

2.     Beginning in at least January 2003 and continuing through on or about June 30, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS,
MARTIN O'MALLEY, and
KAREN FINLEY

defendants herein, did conspire with each other, Individuals A and B, and others:

a.     to corruptly solicit and demand, and to accept and agree to accept from another person things of value, namely cash payments and other personal financial benefits, for the benefit of JOHN BILLS and MARTIN O'MALLEY, intending that JOHN BILLS, an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding during each of the twelve-month calendar years from 2003 through 2011, be influenced and rewarded in connection with any business, transaction, and series of transactions of $5,000 or more of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program, in violation of Title 18, United States Code, Section 666(a)(1)(B); and

b.     to corruptly give, offer, and agree to give things of value, namely cash payments and other personal financial benefits, for the benefit of JOHN BILLS and MARTIN O'MALLEY, with intent to influence and reward JOHN BILLS, an

27

agent of the City of Chicago, a local government that during each of the twelve-month calendar years from 2003 through 2011, received federal benefits in excess of $10,000, in connection with any business, transaction, and series of transactions of $5,000 or more of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program, in violation of Title 18, United States Code, Section 666(a)(2).

3. It was part of the conspiracy that, in exchange for defendant BILLS' efforts, as manager of the City's DARLEP, to assist Redflex in obtaining, keeping, and growing its DARLEP contracts with the City, including his providing inside information, BILLS and Redflex officials, including defendant FINLEY and Individual B, arranged for defendant O'MALLEY to be hired as an independent contractor for Redflex and to receive lucrative compensation, much of which O'MALLEY agreed to pass on to BILLS, and in addition, at BILLS' request, Redflex agents, including Individual A, FINLEY, and O'MALLEY, provided Bills with personal financial benefits, including meals, hotel stays, rental cars, and golf outings.

### OVERT ACTS

4. In furtherance of the conspiracy and to effect its objects and purposes, defendants BILLS, O'MALLEY, FINLEY and Individuals A and B committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

28

a.      On or about February 13, 2003, defendant FINLEY, Individual A and others from Redflex met defendant BILLS at the John Hancock Center in Chicago, where BILLS provided information in an effort to give Redflex an advantage over its competitor in the pilot phase.

b.      On or about early December 2003, defendant FINLEY signed defendant O'MALLEY's contract with Redflex.

c.      On or about April 30, 2004, defendant O'MALLEY withdrew from his bank account $8,500 in cash, of which he gave approximately $8,000 in cash to defendant BILLS.

d.      On or about March 2, 2005, defendant O'MALLEY withdrew from his bank account $11,500 in cash, of which he gave approximately $11,000 in cash to defendant BILLS.

e.      Or about September 15, 2006, defendant O'MALLEY withdrew from his bank account $7,200 in cash, of which he gave approximately $7,000 in cash to defendant BILLS.

f.      On or about May 24, 2007, defendant FINLEY and Individual A emailed about the need for "damage control" because one of defendant O'MALLEY's invoices for commissions had been sent to a Redflex employee other than the two of them.

g.      On or about June 4, 2007, in an e-mail exchange with Individual A regarding the drafting of documents that would give Redflex an advantage in obtaining the 2008 DARLEP contracts, defendant FINLEY admonished Individual

A that Individual A's discussions with defendant O'MALLEY about the drafts should not be in writing and advised that FINLEY was deleting her e-mails regarding the drafts as she was sending them.

h.  On or about August 15, 2007, defendant O'MALLEY withdrew from his bank account $6,000 in cash, which he gave to defendant BILLS.

i.  On or about October 17, 2007, defendant FINLEY sent an email to other Redflex employees who had raised questions regarding defendant O'MALLEY's contract and the significant increase in payments to O'MALLEY that the contract appeared to require, in which she stated that the contract would remain "parked for now."

j.  On or about June 25, 2008, at defendant BILLS' direction, defendant O'MALLEY wrote a check for $6,050 payable to Individual C, to whom BILLS owed money.

k.  On or about June 19 and June 22, 2009, defendant O'MALLEY withdrew from his bank account $7,000 and $3,500 in cash, respectively, and, shortly thereafter, gave defendant BILLS at least $10,000 in cash.

l.  On or about June 22, 2009, defendant BILLS purchased a used Mercedes-Benz for $12,500 in cash.

m.  On or about August 19, 2009, Individual A arranged for a car rental for defendant BILLS in Phoenix.

n.     On or about September 3, 2009, Individual A approved reimbursement by Redflex for a car rental for defendant BILLS that took place from August 19 to August 23, 2009.

o.     On or about October 14, 2009, Individual A arranged for a car rental for defendant BILLS in Phoenix.

p.     On or about November 11, 2009, Individual A approved reimbursement by Redflex for a car rental for defendant BILLS that took place from October 16 to October 19, 2009.

q.     On or about December 4, 2009, defendant BILLS sent an e-mail to defendant O'MALLEY with the subject line "Meeting" in which he wrote, "Are we on today?"

r.     On or about December 3, 2009, defendant O'MALLEY withdrew from his bank account $6,700 in cash and, shortly thereafter, gave defendant BILLS approximately $6,000 in cash.

s.     On or about March 23, 2010, defendant FINLEY approved the payment for a hotel stay from March 12 to March 15, 2010, at the Biltmore in Arizona for defendant BILLS.

t.     On or about March 25, 2010, defendant BILLS sent an e-mail to defendant O'MALLEY setting up lunch for that day.

u.     On or about March 25, 2010, defendant O'MALLEY withdrew from his bank account $7,000 in cash and, shortly thereafter, gave defendant BILLS approximately $7,000 in cash.

31

v.      On or about March 25, 2010, at defendant BILLS' direction, defendant O'MALLEY wrote a check for $3,000 payable to Individual C, to whom BILLS owed money.

w.      On or about July 16, 2010, defendant BILLS sent an e-mail to defendant O'MALLEY setting up lunch for the following Monday, July 19, 2010.

x.      On or about July 16, 2010, defendant O'MALLEY withdrew from his bank account $6,200 in cash and, on or about July 19, 2010, gave defendant BILLS approximately $6,000 in cash.

y.      On or about February 17, 2011 defendant O'MALLEY sent an e-mail to defendant BILLS setting up lunch for that day.

z.      On or about February 16, 2011 defendant O'MALLEY withdrew from his bank account $8,200 in cash and shortly thereafter gave defendant BILLS approximately $8,000 in cash.

aa.      On or about March 9, 2011, defendant O'MALLEY sent defendant BILLS an email with the subject line, "Ride," in which O'MALLEY wrote, "Downstairs" to which BILLS responded, "On my way."

bb.      On or about both March 8, 2011 and March 9, 2011, defendant O'MALLEY withdrew from his bank account $4,400 in cash, respectively, and shortly thereafter gave defendant BILLS approximately $8,000 in cash.

cc.      On or about April 14, 2011, defendant BILLS sent defendant O'MALLEY an email asking, "When can we have lunch," to which O'MALLEY responded, "I will try for tomorrow."

dd. On or about April 15, 2011, defendant O'MALLEY withdrew from his bank account $6,200 in cash and shortly thereafter gave defendant BILLS approximately $6,000 in cash.

ee. On or about May 5, 2011, defendant O'MALLEY sent defendant BILLS an email with the subject line "Lunch" in which he wrote, "Are you on your way!" On that same date, O'MALLEY withdrew from his back account $6,000 in cash and shortly thereafter gave defendant BILLS approximately $6,000 in cash.

ff. On or about June 6, 2011, defendant BILLS sent an e-mail to defendant O'MALLEY in which he said, ". . . how about lunch at shallers tomorrow. 8 page speed overview can be discussed at lunch if your schedule permits."

gg. On or about June 6 and June 7, 2011, defendant O'MALLEY withdrew from his bank account $4,200 and $4,300 in cash, respectively, and, shortly thereafter, gave defendant BILLS approximately $8,000 in cash.

hh. On or about June 20, 2011, Individual A and other Redflex employees met with defendant BILLS for dinner and drinks in Chicago and discussed possible employment options Redflex could arrange for BILLS after he retired from his position with the City of Chicago.

ii. On or about June 28, 2011, defendant O'MALLEY sent defendant BILLS an email with the subject line "Lunch" in which he wrote, "How late are you going to be???" On that same date, O'MALLEY withdrew from his back account $6,200 in cash and shortly thereafter gave defendant BILLS approximately $6,000 in cash.

All in violation of Title 18, United States Code, Section 371.

## COUNT FIFTEEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1 of Count One is incorporated here.

2.      On various occasions from August 13, 2009, through December 31, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### JOHN BILLS,

defendant herein, as an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding in the twelve-month period from January 1, 2009 through December 31, 2009, corruptly solicited and demanded for his own benefit and for the benefit of Martin O'Malley, and accepted and agreed to accept things of value, namely, cash payments and other personal financial benefits, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of $5,000 or more, of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT SIXTEEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1. Paragraph 1 of Count One is incorporated here.

2. On various occasions throughout 2010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS,

defendant herein, as an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding in the twelve-month period January 1, 2010 through December 31, 2010, corruptly solicited and demanded for his own benefit and for the benefit of Martin O'Malley, and accepted and agreed to accept things of value, namely, cash payments and other personal financial benefits, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of $5,000 or more, of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT SEVENTEEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.  Paragraph 1 of Count One is incorporated here.

2.  On various occasions from the beginning of 2011 to on or about June 30, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN BILLS,

defendant herein, as an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding in the twelve-month period January 1, 2011 through December 31, 2011, corruptly solicited and demanded for his own benefit and for the benefit of Martin O'Malley, and accepted and agreed to accept things of value, namely, cash payments and other personal financial benefits, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of $5,000 or more, of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

37

## COUNT EIGHTEEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraph 1 of Count One is incorporated here.

2.     On various occasions from August 13, 2009, through December 31, 2009, in the Northern District of Illinois, Eastern Division, and elsewhere,

### KAREN FINLEY,

defendant herein, corruptly gave, offered, and agreed to give things of value, namely cash payments and other personal financial benefits, for the benefit of Martin O'Malley and John Bills, with the intent to influence and reward John Bills, an agent of the City of Chicago, a municipal government that received federal benefits in excess of $10,000 in the twelve-month period from January 1, 2009 through December 31, 2009, in connection with any business, transaction, and series of transactions of $5,000 or more of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program;

In violation of Title 18, United States Code, Section 666(a)(2).

## COUNT NINETEEN

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      Paragraph 1 of Count One is incorporated here.

2.      On various occasions throughout 2010, in the Northern District of Illinois, Eastern Division, and elsewhere,

KAREN FINLEY,

defendant herein, corruptly gave, offered, and agreed to give things of value, namely cash payments and other personal financial benefits, for the benefit of Martin O'Malley and John Bills, with the intent to influence and reward John Bills, an agent of the City of Chicago, a municipal government that received federal benefits in excess of $10,000 in the twelve-month period from January 1, 2010 through December 31, 2010, in connection with any business, transaction, and series of transactions of $5,000 or more of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program;

In violation of Title 18, United States Code, Section 666(a)(2).

## COUNT TWENTY

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.     Paragraph 1 of Count One is incorporated here.

2.     On various occasions throughout 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

### KAREN FINLEY,

defendant herein, corruptly gave, offered, and agreed to give things of value, namely cash payments and other personal financial benefits, for the benefit of Martin O'Malley and John Bills, with the intent to influence and reward John Bills, an agent of the City of Chicago, a municipal government that received federal benefits in excess of $10,000 in the twelve-month period from January 1, 2011 through December 31, 2011, in connection with any business, transaction, and series of transactions of $5,000 or more of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program;

In violation of Title 18, United States Code, Section 666(a)(2).

## COUNT TWENTY-ONE

The SPECIAL MARCH 2013 GRAND JURY further charges:

On or about March 9, 2009, in the Northern District of Illinois, Eastern Division,

### JOHN BILLS,

defendant herein, willfully made, subscribed, and caused to be made and subscribed, a United States Individual Income Tax Return (Form 1040 with schedules and attachments), for the calendar year 2008, which return was verified by written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which income tax return he did not believe to be true and correct as to every material matter, in that Line 22 stated that his total income was $102,519, whereas, in truth and fact, as BILLS knew, his total income was in excess of that amount, in that BILLS failed to report other income received in calendar year 2008, including payments received from Martin O'Malley;

In violation of Title 26, United States Code, Section 7206(1).

42

## COUNT TWENTY-TWO

The SPECIAL MARCH 2013 GRAND JURY further charges:

On or about April 12, 2010, in the Northern District of Illinois, Eastern Division,

### JOHN BILLS,

defendant herein, willfully made, subscribed, and caused to be made and subscribed, a United States Individual Income Tax Return (Form 1040 with schedules and attachments), for the calendar year 2009, which return was verified by written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which income tax return he did not believe to be true and correct as to every material matter, in that Line 22 stated that his total income was $102,327, whereas, in truth and fact, as BILLS knew, his total income was in excess of that amount, in that BILLS failed to report other income received in calendar year 2009, including payments received from Martin O'Malley;

In violation of Title 26, United States Code, Section 7206(1).

42

## COUNT TWENTY-THREE

The SPECIAL MARCH 2013 GRAND JURY further charges:

On or about April 17, 2012, in the Northern District of Illinois, Eastern Division,

### JOHN BILLS,

defendant herein, willfully made, subscribed, and caused to be made and subscribed, a United States Individual Income Tax Return (Form 1040 with schedules and attachments), for the calendar year 2011, which return was verified by written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which income tax return he did not believe to be true and correct as to every material matter, in that Line 22 stated that his total income was $79,422, whereas, in truth and fact, as BILLS knew, his total income was in excess of that amount, in that BILLS failed to report other income received in calendar year 2011, including payments received from Martin O'Malley;

In violation of Title 26, United States Code, Section 7206(1).

43

## FORFEITURE ALLEGATION

The SPECIAL MARCH 2013 GRAND JURY further charges:

1.      The allegations of Counts One through Twenty of this indictment are incorporated here for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      As a result of their violations of Title 18, United States Code, Sections 666, 1341, 1343, 1346, and 1951, as alleged in the foregoing indictment,

JOHN BILLS,<br>
MARTIN O'MALLEY, and<br>
KAREN FINLEY,

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all right, title, and interest they may have in any property, real and personal, that constitutes and is derived, directly and indirectly, from gross proceeds traceable to the commission of the charged offenses.

3.      The interests of the defendants subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) include, but are not limited to, all money and property that constituted and was derived from the proceeds traceable to the violations, estimated as including approximately $613,400 and the proceeds derived from the sale of the condominium at 1633 East Lakeside Drive, Unit 113, Gilbert, Arizona.

4.      If any of the property subject to forfeiture and described above, as a result of any act or omission of the defendants:

44

a. Cannot be located upon the exercise of due diligence;

b. Has been transferred or sold to, or deposited with, a third party;

c. Has been placed beyond the jurisdiction of the Court;

d. Has been substantially diminished in value; or

e. Has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

45