FILED

DEC 1 0 2014
1 2 -10 - 2014
JUDGE VIRGINIA M. KENDALL
U.S DISTRICT COURT

RECEIVED

DEC 1 0 2014

JUDGE VIRGINIA M. KENDALL
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MARTIN O'MALLEY

No. 14 CR 135-2

Judge Virginia M. Kendall

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant MARTIN O'MALLEY, and his attorney, MICHAEL GILLESPIE, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure.  The parties to this Agreement have agreed upon the following:

## Charge in This Case

2.     The indictment in this case charges defendant with conspiracy, in violation of Title 18, United States Code, Section 371, to commit federal program bribery, prohibited by Title 18, United States Code, Section 666(a)(1)(B), in relation to the payment of bribes in exchange for City of Chicago contracts (Count Fourteen).

3.     Defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crime with which he has been charged.

**Charge to Which Defendant Is Pleading Guilty**

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count Fourteen of the indictment, which charges defendant with conspiracy, in violation of Title 18, United States Code, Section 371, to commit federal program bribery, prohibited by Title 18, United States Code, Section 666(a)(1)(B), in relation to the payment of bribes in exchange for City of Chicago contracts. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

**Factual Basis**

6.    Defendant will plead guilty because he is in fact guilty of the charge contained in the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning in at least January 2003 and continuing through on or about June 30, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant O'Malley did conspire with John Bills, Karen Finley, Individuals A and B, and others to corruptly solicit and demand, and to accept and agree to accept from another person things of value, namely cash payments and other personal financial benefits, for the benefit of Bills and O'Malley, intending that Bills, an agent of the City of Chicago, a local government that received in excess of $10,000 in federal funding during each of the twelve-month calendar years from 2003

2

through 2011, be influenced and rewarded in connection with any business, transaction, and series of transactions of $5,000 or more of the City of Chicago, namely contracts for the Digital Automated Red Light Enforcement Program.

Specifically, in 2002, O'Malley met and became friends with John Bills. In about March 2003, Bills told O'Malley words to the effect of, "I got something coming up," referring to a possible job opportunity, as Bills was aware that O'Malley was struggling financially. Bills said the job would be a part-time position with a photo-enforcement company, and it would pay about $30,000 a year.

A month or two after Bills first told O'Malley he might have a job for O'Malley, Bills told O'Malley to look in the Chicago Tribune on a specific day for a job posting for Redflex Traffic Systems, and apply for the job. Bills said the posting would not specify that Redflex was the company seeking job candidates, but O'Malley could identify the posting because it would contain a telephone or fax number with an Arizona area code. O'Malley found the posting, sent in his resume and told Bills he had sent in his resume.

In about July 2003, O'Malley received a telephone call from Individual B, a Redflex executive, who asked O'Malley to come to Arizona for an interview. Later in July 2003, O'Malley traveled to Phoenix and was interviewed in the Redflex offices by Individual B and Karen Finley. Individual B and Finley told O'Malley they were looking to hire a contract employee as the Chicago Customer Service Representative at $30,000 to $35,000 a year. O'Malley requested $60,000 to

$65,000 a year, which Individual B and Finley agreed to. After the interview, O'Malley called Bills and told him the interview went well.

After the interview and before an official offer was made, O'Malley asked Bills, rather than anyone from Redflex, about the status of Redflex hiring O'Malley. Bills told O'Malley that Redflex and the City of Chicago needed to finalize their contract and that Bills would call Redflex to inquire about O'Malley's employment status.

During the period before O'Malley signed a contract with Redflex, Bills told O'Malley words to the effect of, "We are working on the contract." Bills said he was trying to add a signing bonus and commissions into the contract, which O'Malley had not discussed with Individual B or Finley. During these conversations with Bills, O'Malley came to understand that parts of O'Malley's compensation from Redflex would not be legitimate. Specifically, Bills told O'Malley that he and O'Malley would share any commissions O'Malley received, and he said words to the effect of, "this is the way business is done." O'Malley knew that Bills would be getting money from Redflex commissions in exchange for Bills' helping Redflex get contracts with the City of Chicago. O'Malley understood at the time of these conversations that giving a portion of the commission payments to Bills would be wrong and illegal but agreed to do so because O'Malley needed a job.

O'Malley discussed the final contract with Bills before signing it in about November of 2003. By the time O'Malley signed the contract, or sometime shortly thereafter, O'Malley understood, from what Bills said, that O'Malley would keep the

4

$60,000 in annual fees and that Bills would get the commissions, but that Bills would reward O'Malley somewhere down the line. At some point, Bills and O'Malley agreed that O'Malley would have to pay the taxes on the commissions since O'Malley was on record as earning them. Months after the contract was signed, Bills told O'Malley that he would split the commissions half and half; however, in reality Bills received most of the after-tax commissions.

From 2003 to 2011, pursuant to the O'Malley contract, O'Malley was paid over $2 million. From late 2003 through 2006, Redflex paid O'Malley approximately $175,000 in salary payments (approximately $60,000 per year), $35,000 in reimbursed expenses, and $85,000 in bonuses and commissions. Between 2007 and 2011, Redflex paid O'Malley approximately $290,000 in salary payments (in mid-2007, at the request of O'Malley, Redflex increased O'Malley's salary from $2,300 to $2,500 twice a month), $12,000 in reimbursed expenses, and the following in bonuses and commissions: $87,400 (2007), $342,026 (2008), $515,046 (2009), $193,205 (2010), and $289,757 (2011).

O'Malley invoiced Redflex for his commissions. Bills told O'Malley when O'Malley needed to send Redflex an invoice, and Bills gave O'Malley paperwork showing how many camera installations had occurred over a certain time period, how to calculate the commission, and what the total commission should be. For each payment, O'Malley prepared an invoice and sent it to Redflex. Bills then followed up with O'Malley to find out when O'Malley received the commission. It usually took about 30 days after O'Malley sent the invoice. Redflex mailed the

5

commission checks to a Post Office box that O'Malley set up at 3400 W. 111th St., number 159, Chicago, IL 60655.

When O'Malley received a commission check, Bills and O'Malley met so that O'Malley could provide Bills with his share of the commission. Bills and O'Malley often met for lunch at Chicago restaurants during normal work hours, and Bills arrived at the meetings in his city vehicle. Before O'Malley met with Bills, O'Malley withdrew cash, and then gave the cash to Bills during the meeting. Bills sometimes specified to O'Malley how much cash he wanted by speaking in code. For example, on or about June 6, 2011, Bills sent an e-mail to O'Malley in which he wrote, ". . . how about lunch at shallers tomorrow. 8 page speed overview can be discussed at lunch if your schedule permits." O'Malley understood Bills' reference to "8" to mean that Bills expected O'Malley to provide him $8,000 in cash. On or about June 6 and June 7, 2011, O'Malley withdrew from his bank account $4,200 and $4,300 in cash, respectively, and, shortly thereafter, gave defendant Bills approximately $8,000 in cash.

In general, when O'Malley made cash withdrawals greater than $1,000, he gave all or most of the cash to Bills. When O'Malley withdrew a large amount of cash that was not an even thousand dollar figure, O'Malley gave Bills the total amount of the withdrawal, less the hundreds figure, and O'Malley kept the remaining hundreds amounts for himself. For example, on or about June 28, 2011, O'Malley sent Bills an email with the subject line "Lunch" in which he wrote, "How late are you going to be???" On that same date, O'Malley withdrew from his bank

6

account $6,200 in cash and shortly thereafter gave Bills approximately $6,000 in cash and kept the remaining $200 for himself.

In addition to the cash O'Malley gave Bills, O'Malley also wrote checks to people at Bills' request. Bills sometimes asked O'Malley to write a check to a particular person for a particular amount. For example, on or about June 25, 2008, and March 25, 2010, at Bills' direction, O'Malley wrote checks payable to Individual C, to whom Bills owed money. In addition, Bills asked O'Malley to write checks to a political organization and to write a check and provide cash to pay for a portion of Bills' retirement party. O'Malley also bought Bills meals, golf, and other personal expenses. O'Malley then included the costs on his expense reports that Redflex reimbursed. O'Malley did this because O'Malley understood, from Finley and Individuals A and B, that his job was to keep Bills and the City of Chicago happy so that Redflex could maintain and expand its business with the City of Chicago.

In 2008, Bills and O'Malley agreed that O'Malley would use approximately $76,000 from the commissions he had received from Redflex to buy a condo in Arizona in O'Malley's name but for their joint use. Bills found the condo, and O'Malley gave Bills a check for the earnest money payment. O'Malley paid all the expenses associated with the condo, including the down payment, mortgage, interest, assessments, taxes, utilities, insurance, and cable, from Redflex commission payments and without any financial assistance from Bills. O'Malley visited the condo only three times – once with Bills shortly after the condo was purchased; once with his wife, who was ill; and once with his son, when he was

preparing to sell the condo in 2013. Bills used the condo whenever he wanted to. Bills told O'Malley that he kept his Mercedes convertible at the condo.

In 2013, O'Malley sold the Arizona condo. The sale of the condo closed on July 19, 2013, for $149,900. From the proceeds of the sale of the condo, $40,475.25 went to pay off the balance of the mortgage that O'Malley held on the property and $98,837.84 was deposited into an account controlled by O'Malley.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

8. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a. A maximum sentence of 5 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

b.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

9.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2014 Guidelines Manual.

b.     **Offense Level Calculations.**

i.     Pursuant to USSG §2C1.1(a)(1), the base offense level is 12.

ii.     Pursuant to USSG §2C1.1(b)(1), because the offense involved more than one bribe, the offense level is increased by 2 levels.

iii.     Pursuant to USSG §2C1.1(b)(2), because the value to be obtained exceeded $5000, the offense level is increased by the number of levels from

9

the table in §2B1.1. Pursuant to USSG §2B1.1(b)(1)(I), a 16 level increase is warranted because the value of the property obtained was more than $1,000,000 but less than $2,500,000.

iv.     Pursuant to USSG §2C1.1(b)(3), a four level increase is warranted because the offense involved a public official in a high-level decision-making or sensitive position.

v.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vi.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c. **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d. **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 31, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 108 to 135 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. However, pursuant to Guideline § 5G1.1(a), because the statutory maximum sentence on the Count to which defendant will plead guilty is 5 years' imprisonment, which is less than the minimum of the applicable guidelines range, 5 years shall be the advisory guidelines sentence.

e. Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the

probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

11.     Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing.   The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines.   The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

12.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois.  This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding.  Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

13.    Each party is free to recommend whatever sentence it deems appropriate.

14.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

15.    Regarding restitution, defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing.

16.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing.

17.    Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

18.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

19.    Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

## Forfeiture

20.    The defendant is liable to the United States for approximately $98,837.84, which funds are subject to forfeiture because those funds constitute proceeds of the violation alleged in Count Fourteen.  By entry of a guilty plea to Count Fourteen of the indictment, defendant acknowledges that the funds identified above are subject to forfeiture.

21.    Defendant agrees to the entry of a forfeiture judgment in the amount of $98,837.84, in that these funds are subject to forfeiture.  Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described funds and further agrees to the seizure of these funds so that these funds may be disposed of according to law.

22.    Defendant understands that forfeiture of these funds shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.    In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to

14

Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

23.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 135.

24.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

25.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

15

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.

16

Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf.  If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify.  If defendant desired to do so, he could testify in his own behalf.

viii.     With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

b.     **Waiver of appellate and collateral rights**.   Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.  Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this,  defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine

17

within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

26. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

27. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

28.   Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

29.   For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

**Other Terms**

19

30.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

31.     Regarding matters relating to the Internal Revenue Service, defendant agrees as follows:

a.     Defendant agrees to cooperate with the Internal Revenue Service in any tax examination or audit of defendant which directly or indirectly relates to or arises out of the course of conduct that defendant has acknowledged in this Agreement, by transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request.

b.     Defendant will not object to a motion brought by the United States Attorney's Office for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i).  In addition, defendant will not object to the government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the United States Attorney's Office, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service), for use in civil or administrative proceedings or investigations, rather than returning them to the third parties for later summons or subpoena in

20

connection with a civil or administrative proceeding involving, or investigation of, defendant. Nothing in this paragraph or the preceding paragraph precludes defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

### Conclusion

32. Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

33. Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

34.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

35.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

36.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney.     Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: Dec 10. 2014


_____
ZACHARY T. FARDON
United States Attorney

_____
CARRIE E. HAMILTON
Assistant U.S. Attorney

_____
MARTIN O'MALLEY
Defendant

_____
MICHAEL GILLESPIE
Attorney for Defendant


22