UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
|     Plaintiff | ) | No. 14-CR-135 |
| | ) | |
|     v. | ) | Hon. Virginia Kendall |
| | ) | District Judge |
| JOHN BILLS | ) | |
|     Defendant. | ) | |

**DEFENDANT JOHN BILLS'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A CHANGE OF VENUE**

Now comes John Bills, by and through his attorney, and hereby moves this Court for a change of venue for the trial in this matter. In support thereof, Bills states as follows:

**INTRODUCTION**

John Bills cannot receive a fair trial in this town. He is accused of being a central player in a transaction that helped bring about one of the most unpopular regulatory programs in the City of Chicago's history – the red light cameras. The government alleges that Mr. Bills corruptly benefitted from awarding the contract for these cameras.

The coverage in the Chicago news media about these developments has been pervasive, relentless, and fierce, dating back to 2012, when the Chicago Tribune commenced an investigation into the red light cameras contract.[1] Over a year and a half ago, on March 2, 2013, the Tribune reported that Redflex admitted that "it likely bribed [a] Chicago official," identifying Mr. Bills by name as the official.[2] Mr. Bills, his co-defendants, and Redflex have been mentioned in dozens of news stories in just the major Chicago media outlets over the past two

---

[1] See Exhibit 1: Red light cameras investigation - Chicago Tribune
[2] Exhibit 2: Bribery likely, says red light firm Redflex - Chicago Tribune

years, most of them in a disapproving tone. Much has been made of Mr. Bills' ties to Redflex and to Speaker of the Illinois House Mike Madigan. Other media coverage has focused on Chicagoans' general dissatisfaction with and objection to the cameras as well as Redflex's alleged ethical lapses in other parts of the country.

As the City, Cook County, and many other municipalities in the Northern District of Illinois have been subject to this unending press, and as these localities make extensive use of these unpopular cameras, a jury is unlikely to be able to check its bias at the door and dispassionately decide solely on the basis of the evidence before it whether or not Mr. Bills is guilty. So as to ensure a fair and impartial jury, minimize potential prejudice, and eliminate the risk that a victim of the red light cameras is empanelled, this trial should be moved from the Northern District of Illinois to a jurisdiction where Mr. Bills can receive a fair trial, pursuant to the Fifth and Sixth Amendment and Fed. R. Crim P. 21(a). Mr. Bills suggests the federal district court in Nevada, with its geographic distance from any jurisdiction currently employing red light cameras, would be a suitable alternative.

## BACKGROUND

John Bills served the City of Chicago for thirty-two years, from 1979 to 2011; his final position was Managing Deputy Commissioner of the Chicago Department of Transportation. In May of this year, Mr. Bills was indicted along with two others; he had been the subject of public scrutiny for more than a year and a half prior to the indictment, and the scrutiny only intensified after the arrest.

Mr. Bills was charged with numerous counts of wire, mail, and honest services fraud as well as federal program bribery, relating to his alleged receipt of money, gifts, and favors in exchange for steering the Chicago red light camera program toward Redflex Traffic Systems, a

vendor of the cameras. His co-defendants in this action are the CEO of Redflex, Karen Finley, and Martin O'Malley, a longtime friend of Mr. Bills who was employed by Redflex and was the alleged intermediary between Redflex executives and Mr. Bills.

The media coverage of this issue has dated back almost two years, long before the indictment. Because of its depth and pervasiveness, and because of the general public distrust of red light cameras, Mr. Bills is highly unlikely to receive a fair trial in the Northern District of Illinois. This Court should move the case to a different venue.

## ARGUMENT

A criminal defendant has the absolute right to be tried by a fair, impartial jury of his peers. U.S. Const. Amend. VI; *United States v. Skilling*, 130 S. Ct. 2896, 2912-13 (2010). Without "a panel of . . . 'indifferent' jurors[,]" the defendant's due process rights are compromised. *Irvin*, 366 U.S. at 722. Although the Constitution states that trials should occur in the "district wherein the crime shall have been committed," U.S. Const. Amend. VI, the Federal Rules of Criminal Procedure create an exception when pre-trial prejudice warrants a change of venue:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a).

A change of venue is proper when a defendant can show that the "trial atmosphere . . . [is] utterly corrupted by press coverage." *Skilling*, 130 S. Ct. at 2914. This "presumption of prejudice" thus prevents him from being able to receive a fair trial in that jurisdiction. *Id.* Courts look to the totality of the circumstances in determining whether a presumption of prejudice exists. *Brecheen v. Oklahoma*, 485 U.S. 909, 910 (1988). In conducting this analysis, courts may

look to various factors, including: 1) the size and characteristics of the community where the crime occurred; 2) the nature of the news stories; and 3) the time that elapsed between the news coverage and the trial. *United States v. Philpot*, 733 F.3d 734, 741 (7th Cir. 2013) (citing *Skilling,* 130 S.Ct. at 2915-16). A fourth factor is whether the source of the news coverage is either the defense or the prosecution, which would enable the judge to take control of the dissemination. *Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966);

The first of these factors seemingly favors allowing the trial to remain in the Northern District, as the Chicago metropolitan area is large. However, as will be explained later in this motion, this factor should instead weigh in Mr. Bills's favor. Meanwhile, the second, third, and fourth factors all unambiguously favor moving the trial to a new venue, and they will be discussed first.

**I. The nature of the news stories favors a transfer of venue because the stories have been harsh and unrelenting in their criticism of Mr. Bills and Redflex**

    i.    **The negative reporting of Mr. Bills and Redflex**

A review of the pretrial publicity related to Mr. Bills's case inescapably leads to the conclusion that a change of venue is necessary to ensure that Mr. Bills is tried by an impartial jury. The coverage of this case since before the indictment has been comprehensive and thorough. A search of the websites of just the six major Chicago media sources (Chicago Tribune, Chicago Sun-Times, CBS, NBC, ABC, and Fox) yields over 100 articles discussing Mr. Bills, with articles discussing his involvement with Redflex dating back to October 14, 2012.[3] A similar search for "Redflex" yields over 150 articles among those outlets. The Chicago Tribune also has its own independent watchdog investigation dedicated exclusively to Mr. Bills and the

---

[3] Exhibit 3: "City red-light camera vendor under scrutiny" by David Kidwell

red light cameras,[4] which has at least one reporter, David Kidwell, working primarily on this case. These articles – whether citing the charging information or from other sources – have painted Mr. Bills and Redflex in an extremely negative light. The damaging quotations include:

- "I want to send a clear message to everybody," Emanuel said. "There will be zero tolerance for those type of actions, and so while it's directed specifically at Redflex and what they did in 2010 prior to my being mayor, there will be not only zero tolerance, I want other firms that do business with the city to understand that action."[5]

- Chicago's embattled red light camera firm went to City Hall on Friday in its latest effort to come clean, acknowledging for the first time that its entire program here was likely built on a $2 million bribery scheme. By its sheer size, the alleged plot would rank among the largest in the annals of Chicago corruption.[6]

- Just when one might be tempted to think we surely have plumbed the depths of the venality of Chicago politics, along comes the case of John Bills and the city's red-light camera contract to prove us wrong.[7]

- John Bills, 52, allegedly got bribes including a Arizona condo and a used Mercedes to steer $124 million of taxpayer money to Redflex Traffic Systems, the Australian-owned business that helped ensure Chicago has more red-light cameras than anywhere else in the United States. Super Bowl tickets, golf outings, a laptop, a boat, his children's school fees, a retirement party — even his girlfriend's mortgage and his own divorce attorney.[8]

- The bribery scandal, among the most brazen ever to envelop City Hall, centers at least for now on Bills, a 32-year bureaucrat portrayed in a court filing last week as a man unembarrassed by his own greed, whose demands for more never ceased and who pitted one bidder against another in order to sweeten his own deal…His cousin Guy was an outfit turncoat who entered the federal witness protection

---

[4] See "Red Light Cameras," http://www.chicagotribune.com/news/watchdog/redlight/
   In a series of stories beginning in 2012, the Tribune has exposed a questionable relationship between Chicago's red-light camera vendor and City Hall. Some of those revelations led to an ongoing federal criminal investigation and other probes that have cost Redflex Traffic Systems Inc. its Chicago contract and resulted in the resignation of the company's top executives. In addition, the Tribune has raised questions about the company's early connections to the speed-camera program launched by Mayor Rahm Emanuel.

[5] Exhibit 4: "Chicago pulls red-light camera bid over alleged failure to disclose ethics breach"
[6] Exhibit 5: "Red light camera firm admits it likely bribed Chicago official" by David Kidwell
[7] Exhibit 6: "Feds say city employee was working the red-light district" by Mark Brown
[8] Exhibit 7: "Ex-City Hall boss took bribes in red-light program: feds" by Kim Janssen

program. His uncle was once shot during a brawl by Angelo "the Hook" La Pietra, who would later become an infamous South Side mob boss. His dad, who spent 35 years working in the city's Forestry Department, was arrested in his youth for taking bets on horses.[9]

- The former CEO of Chicago's fired red light camera vendor, Redflex Traffic Systems Inc., pleaded not guilty Wednesday to federal charges that she helped orchestrate a decade long $2 million bribery scheme to win and grow the largest automated traffic enforcement program in the nation. Karen Finley, 54, of Cave Creek, Ariz., is accused of conspiring to funnel cash, lavish vacation trips and an Arizona condominium to now-retired city transportation manager John Bills.[10]

This is merely a sample of the prejudicial statements and quotes in the major Chicago media, and does not include other websites devoted to commentary about Chicago affairs such as Chicagoist.com or Theexpiredmeter.com, or personal blogs, social media websites, and online message boards. The bias in the media coverage is undeniable and allowing Mr. Bills to be tried before a jury that has had access to this reporting for the past two years would violate his right to a fair trial.

### ii. The publicized connections between Mr. Bills and Mike Madigan

Apart from the slanted media coverage regarding the federal charges, the reporting of Mr. Bills's connections to Mike Madigan, the long-time Speaker of the Illinois House of Representatives, further prejudice his chance of a fair trial.

Mr. Madigan has been the Speaker of the house almost continuously since 1983 – his reign was broken only once, for a two-year period from 1995 to 1997.[11] He is generally regarded as the most powerful man in Illinois politics and has been referred to in the Chicago media as the "King of Illinois"[12] and as someone who "tells governors what they can and cannot do."[13] More

---

[9] Exhibit 8: "Colorful past for insider at center of red light probe" by David Kidwell
[10] Exhibit 9: "Ex-CEO of red light camera company pleads not guilty in bribery case"
[11] http://en.wikipedia.org/wiki/Michael_Madigan
[12] Exhibit 10: "Michael Madigan Is the King of Illinois" by James Ylisela Jr.
[13] "Mike Madigan problem can't be ignored" by Phil Kadner

important, however, is the abysmal regard in which the public holds Mr. Madigan: a recent poll conducted by NBC News found his unfavorable rating at 65% – 10 points above the unpopular incumbent governor Pat Quinn.[14]

Mr. Bills has been linked to the disfavored Madigan in a number of media outlets. A lengthy profile of him in the May 17, 2014 edition of the Chicago Tribune described him as a "veteran political worker for…Madigan" who was "valuable to the Madigan operation" and who liked to "mak[e] it known how close he was to Madigan."[15] The Tribune identified him as connected to Madigan as early as October 2012.[16] The Chicago Sun-Times has also reported on Mr. Bills's connections to Madigan.[17]

Suffice it to say, then, that Mr. Bills's chance of a fair trial are further tainted by his supposed strong connections to a career politician who is arguably the most disliked public figure in the state. This Court should therefore find that the prejudice of the Madigan connection is further grounds for moving the trial to a venue that is well-removed from Northern Illinois.

**II. The proximity in time between the media coverage and the trial also weigh in favor of changing the venue**

This unrelenting coverage is notable not just for its sharpness, but also for the time span that it covers. The coverage had been ongoing for more than a year and half before the indictment was unsealed and has continued with no sign of abating. This starkly contrasts with the publicity at issue in *Patton v. Yount*, where the Supreme Court found that the publicity had "softened" in the four years between the first and second trials. *Patton,* 467 U.S. 1025, 1032

---

[14] "POLL: Michael Madigan Less Popular than Gov. Quinn" by Erin Carlson
[15] Exhibit 8: "Colorful past for insider at center of red light probe" by David Kidwell
[16] Exhibit 11: "Ex-city official in red-light camera probe now in county post" by David Kidwell
[17] "Ex-City Hall boss took bribes in red-light program: feds" by Kim Janssen; See also "Feds say city employee was working the red-light district" by Mark Brown, *Chicago Sun-Times*, May 14, 2014.

(1984) (abrogated on other grounds). The Court emphasized how citizens no longer had the same fixed opinions about the defendant's guilt, which proved that there could no longer be a presumption of prejudice. The Seventh Circuit came to a similar conclusion in *United States v. Peters*, where nearly a year had passed since the articles that the defendant submitted to the court had been published. 791 F.2d 1270, 1297 (7th Cir. 1986) (superseded by statute on other grounds). Here, by contrast, the media coverage has not ceased and it does not appear that the coverage will attenuate between now and the trial. The chances of a softening of juror opinion is far less than what was likely in *Patton* or *Peters*.

### III. The source of the negative publicity is not the prosecution or the defense, but the Chicago media; thus, this Court cannot impose restrictions on the publicity

A fourth factor is whether it is within the Court's purview to stem the negative publicity surrounding this trial. As mentioned previously, the Chicago area media has been independently investigating this situation since 2012; the Chicago Tribune has its own reporter and section of the newspaper dedicated to covering this issue. Thus, this Court cannot control the parties' behavior in releasing news, information, and talking points to the media. This is further grounds for removing the case to a venue where the press will not be so relentless in pursuing Mr. Bills and Redflex.

### IV. The strong disapproval of the red light cameras combined with their widespread use also compel granting this motion to transfer venue

The above factors alone are sufficient to warrant transfer. But the most prejudicial aspect of this case is the general animus felt by citizens towards red light cameras. Even if the harsh media coverage of Mr. Bills were absent, he would still be entitled to have his trial moved to a venue where the population from which the venire would be drawn is not regularly exposed to the presence of cameras and the risk that a hefty fine will be assessed for a violation.

Furthermore, the first *Skilling* factor listed above, the size of the community from which the jury is drawn, is not a strong argument against changing venue because the cameras are so widely used in the Eastern Division of the Northern District of Illinois. Even if jury members are not familiar with the media coverage of Mr. Bills and Redflex, they are likely to express their dissatisfaction with the camera system by voting to convict the man who, as the government will argue, bears a great responsibility for the presence of those cameras in the City of Chicago.

i. **The public support for the red light cameras is extremely low, and there is a serious risk that jurors will judge Mr. Bills simply on his association with these cameras**

The general public opinion toward the red light cameras can be characterized as at best, deep skepticism, and at worst, outright hostility. A recent poll taken by the Tribune found that more than ninety percent of Chicagoans disapprove of the red light camera system as it is currently administered.[18] The public regard of the cameras was deeply damaged when it was discovered that the cameras were issuing citations to drivers despite there having been no violation of the traffic laws: over 13,000 tickets were issued to drivers who did not deserve them.[19] Additionally, a putative class action is currently pending before the Illinois Supreme Court, alleging that the camera policy violates both state law and the state constitution.[20] The Chicago Tribune recently opined, reflecting the public view, that "Chicago's red light camera system has lost credibility" and that "the red light cameras are less about safety than about dollar signs. If Mayor Rahm Emanuel can't find a way to restore credibility to the program, he should take those cameras down."[21] Subsequently, the paper editorialized even more strongly against the

---

[18] Exhibit 12: "Chicago Tribune poll: Chicagoans want changes on red light camera program" by Bill Ruthhart. Of the ninety-two percent who disapprove of the cameras, around half believe it should be reorganized, while the other half believe it should be scrapped entirely.

[19] Exhibit 13: "Red light cameras tag thousands for undeserved tickets" by David Kidwell; see also "Furor engulfs Chicago's red-light camera system," *The Herald-News* (Will County), July 28, 2014.

[20] *Keating et al. v. City of Chicago*, No. 116054, argued May 21, 2014.

[21] Exhibit 14: "Chicago's red light camera system has lost credibility" Editorial

cameras: "If you want to run against Mayor Rahm Emanuel, you'd be smart to get a ladder and run around the city taking down the red-light cameras. You'd win a lot of votes."[22] That same piece noted that "there's great suspicion that the cameras have been tinkered with to boost violations — and boost City Hall revenue."[23] And a search of the major Chicago news outlets finds over 200 stories devoted to red light cameras, many of them of a negative tone. It is clear that the general sentiment of outrage against the cameras means that Mr. Bills, as someone who is alleged to be a core player in bringing them to Chicago, is likely to be judged with special animosity, and less likely to simply have his guilt determined based on whether the evidence supports each element of the crimes he is charged with.

> ii. **The first *Skilling* factor, the size of the community from which jurors will be drawn, weighs more in favor of transfer than against because so many municipalities use the cameras**

The first *Skilling* factor, the population of the area from which the jury will be drawn, seems to favor letting the trial proceed in the current venue. Indeed, in *Skilling*, the Court found that the population of the Houston metropolitan area from where the jury would be drawn was sufficiently large (around 4.5 million) such that it would not have been difficult to find twelve people who were not exposed to much pre-trial media coverage about Enron. *Skilling*, 130 S.Ct. at 2915. The population of the Eastern Division of this District is around 8.3 million,[24] or about 3.9 million greater.

Though the pool of potential jurors is much larger in the instant case, the mitigation of the pre-trial media coverage is countered by the fact that even if many potential jurors do not know of the details of Mr. Bills and Redflex, the chances are far greater that they will be familiar

---

[22] "Chicago's red-light camera debacle"
[23] Id.
[24] All population figures are from the 2010 Census and are taken from:
http://www2.illinois.gov/census/Pages/Census2010Data.aspx

with red light cameras. Moreover, it is very likely that many of the jurors will have been among those who have been fined by the cameras.[25] Apart from the City of Chicago, more than 38% of suburban Cook County residents live in cities and towns that also employ these cameras. This means that nearly 70% of Cook County residents – Chicagoans or suburbanites – are subject to double camera coverage from their home city as well as the county.[26] Furthermore, 28% of residents in the Eastern Division excluding Cook County live in cities that use these cameras.[27] These numbers do not even include those who live in cities that do not have cameras, but commute within cities that do and thus expose themselves to liability. Given the sheer number of people who are exposed to red light cameras, it is not reasonable to argue that simply the size of the greater Chicago area is sufficient to allay the risk of pre-trial prejudice to Mr. Bills. Whether jurors have or have not heard about him, they are certainly familiar with the subject matter of this case, and, given the public opinion surrounding these cameras, are almost certainly predisposed against it.

**V. This Court should transfer the venue to a district where there is no risk of pre-trial publicity from knowledge about Mr. Bill's and/or Redflex or red light cameras in general, and where residents are not biased against Illinoisans**

As the pre-trial environment here is highly prejudicial, this Court should designate a venue where juror are likely able to dispassionately weigh the evidence in favor of and against Mr. Bills.

First, the negative publicity surrounding Redflex, and red light cameras in general, in a number of other jurisdictions makes these locations inappropriate for Mr. Bills's trial.

---

[25] As of August 2014, nearly $500 million in revenue has been collected through cameras, meaning nearly 5 million citations have been issued (a citation is $100). Since the 2010 population of Chicago is around 2.7 million, this means that nearly two tickets were issued per Chicago resident, and a much higher ratio when excluding those who are not able to drive.
[26] Id.
[27] Id.

Jurisdictions in a number of states use red light cameras, and some also use speed cameras, and these should be excluded.[28] The prejudice in at least thirteen of these alternative locales would be severe, as Redflex is accused of bribing officials in these states.[29] By contrast, one of the states that currently prohibit these cameras could be a suitable alternative, as the residents there would not have the pre-established negative associations that come with having been subject to the cameras.[30]

In addition, a venue that is geographically well-removed from Illinois would best protect Mr. Bills's right to a fair and impartial trial. A recent poll has shown that drivers from Wisconsin, Iowa, and Indiana dislike those from Illinois.[31] And according to a February 2012 poll, Illinois is the second most disliked state in the country (following only California).[32] A venue where venire members are not physically proximate to Illinois and are less likely to have formed unfavorable opinions of Illinoisans would be most appropriate. Mr. Bills suggests the District of Nevada, with its geographic separation and lack of red light cameras.

## CONCLUSION

As a fair weighing of the pre-trial publicity factors leads to the ineluctable conclusion that Mr. Bills cannot receive a fair and impartial trial in the Eastern Division of the Northern District of Illinois, this Court should grant this motion for a change of venue and transfer the case to a district without physical proximity to Illinois or the presence of red light cameras.

---

[28] Exhibit 15: Printable list of cities
[29] Exhibit 16: "Fired red-light camera executive: Company bribed officials in 13 states, including NJ"; these states are: California, Washington, Arizona, New Mexico, Texas, Colorado, Massachusetts, North Carolina, Florida, New Jersey, Tennessee, Virginia, and Georgia
[30] Exhibit 17: "Questions cloud red-light camera issue"; these states are: Arkansas, Maine, Mississippi, Montana, Nevada, New Hampshire, South Carolina, West Virginia and Wisconsin
[31] Exhibit 18: "Illinois Drivers Despised By Its Neighbors, Study Finds"
[32] Exhibit 19: "Americans love Hawaii, dislike California"

                    Respectfully submitted,

                     **s/ Nishay K. Sanan**
                    **NISHAY K. SANAN**.

**LAW OFFICE OF NISHAY K. SANAN**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 692-0360