UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 14 CR 135-1 |
| v. | ) | |
| | ) | Honorable Virginia Kendall |
| JOHN BILLS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
CONSOLIDATED POST TRIAL MOTIONS**

The United States of America, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant JOHN BILLS's consolidated post-trial motions.

A. **Defendant's Motion for Judgment of Acquittal Must be Denied.**

Defendant argues that the evidence presented at trial was insufficient to sustain a verdict of guilty. (R.159, at 2-4). Defendant claims that the government's case relied "almost exclusively" on Karen Finley, Martin O'Malley, and Aaron Rosenberg, that these witnesses are "inherently unreliable," and that this Court should have disregarded their testimony because "there were no independent witnesses who could testify to the meaning of various documents or the veracity of Finley, O'Malley, or Rosenberg's respective narratives." (R.159, at 3-4). He is wrong.

As defendant acknowledges, his motion for acquittal "may not be granted if, viewing the evidence in the light most favorable to the prosecution, there is relevant evidence from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *United States v. Pope*, 739 F.2d 289, 291 (7th Cir. 1984).

1

Further, "[w]hen applying this standard, a judge must, of course, keep in mind that it is the jury which has the exclusive authority to assess the witnesses' credibility, resolve evidentiary conflicts and draw reasonable inferences from the evidence presented." *Id.* (citation omitted). For this reason, "[a] defendant's burden in showing the evidence was insufficient to support a conviction is 'nearly insurmountable.'" *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)). A conviction will be overturned "'only if the record contains no evidence, regardless of how it is weighed,' from which the jury could have found the defendant was guilty." *Id.* (quoting *Moses*, 513 F.3d at 733). A court "do[es] not second-guess the jury's assessment of the evidence." *Id.* (citing *United States v. Graham,* 315 F.3d 777, 781 (7th Cir. 2003)).

In proving the charges in this case, the government presented an abundance of evidence in addition to the testimony of Finley, O'Malley and Rosenberg. Not only did "independent witnesses" Anthony Rudis, Michael Noonan, and Jack Jarzynka testify that they received payments from defendant in the form of checks written on O'Malley's bank account, thus showing, without any testimony from O'Malley, that O'Malley funneled to defendant money that he received from Redflex, but there was also documentary evidence that showed, without any interpretive witness testimony, that O'Malley obtained his Redflex job through defendant (charts of telephone calls between defendant and O'Malley during the period that O'Malley was interviewing for the Redflex job and as his contract was being negotiated), and that many of O'Malley's withdrawals of thousands of dollars temporally coincided with lunch

2

meetings between defendant and O'Malley, and expensive cash purchases and trips taken by defendant.

Further, the testimony of Finley, O'Malley and Rosenberg was amply supported not only by e-mails that the jury was free to interpret in whatever way they chose, but also by financial records, airline records, and even defendant's own words spoken during a telephone call that was recorded by Rosenberg. Moreover, contrary to defendant's claim that O'Malley's statements were "self-serving," (R.159, at 3), O'Malley's testimony established that his only wrongdoing was passing financial benefits to defendant in exchange for defendant's official action. The evidence showed no other wrongdoing on O'Malley's part. Thus, far from being self-serving, O'Malley's statements were completely self-incriminating.

In short, there was an abundance of evidence, taken in the light most favorable to the government, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.

B. **Defendant's Motion for a New Trial Must be Denied.**

Defendant argues that he is entitled to a new trial for two reasons. First, he asserts that the Court erred by admitting hearsay statements as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). (R.159, at 4-11). Second, defendant contends that the Court erred in denying his motion for change of venue. (R.159, at 12-14). The Court did not err in either instance, and defendant is not entitled to a new trial on either ground.

3

Federal Rule of Criminal Procedure 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). A new trial is required by the "interest of justice" only when the "substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). In considering a motion for a new trial, the court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would have been more reasonable." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand . . . ." *Id.* Thus, it is well settled that motions seeking new trials are disfavored and should be granted sparingly and in "only the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quotation omitted); *United States v. Gillaum*, 372 F.3d 848, 857-58 (7th Cir. 2004) (citation omitted) (providing that courts should exercise "great caution" and be "wary of second guessing" the jury's verdict); *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not granted lightly.").

    1.    *The Court's Admission of Co-Conspirator Statements Was Not Error.*

Defendant contends that he is entitled to a new trial because the Court erroneously admitted co-conspirator hearsay statements under Rule 801(d)(2)(E) because, according to him, the evidence introduced at trial did not establish the

4

existence of a conspiracy or defendant's participation in one, and hearsay statements introduced into evidence were not in furtherance of that conspiracy. (R.159, at 4-15).

### i. The evidence established that a conspiracy existed.

First, defendant argues no "credible witness" testified as to any conspiracy or joint venture. (R.159, at 6). In support, defendant points to post-trial statements made by a juror in a newspaper article, claiming that "[the juror] commented that the jury did not appreciate that the Government relied so heavily 'on three key witnesses who had won deals,' and further addressed the lack of actual connection of Bills to the alleged conspiracy . . . [by stating] that '[y]ou wished there was a smoking gun, a picture of someone handing [Bills] cash, and there wasn't." (*Id.*).

As a preliminary matter, not only are these statements attributed to the juror not evidence, but they are inadmissible on a motion for new trial under Federal Rule of Evidence 606(b)(1), which prohibits testimony of internal jury deliberation matters during "an inquiry into the validity of a verdict or indictment." Fed.R.Crim.P. 606(b)(1); *United States v. Torres-Chavez*, 744 F.3d 988, 997 (7th Cir. 2014) ("Evidence of internal matters, … —including statements or affidavits about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes—is out."). The statements attributed to the juror by the newspaper article cited by defendant strike at the very heart of internal deliberations against which Rule 606(b)(1) guards.

Even if statements by a juror, as reported in a newspaper article, were admissible in a motion for new trial, defendant has failed to show that the jury found no credible evidence of a conspiracy or joint venture and defendant's participation in it. By omitting key passages in the newspaper article, defendant mischaracterizes the reported comments of the juror. Specifically, the article stated: "Jurors didn't like that prosecutors relied so heavily on three key witnesses who had won deals, [the juror] said, *but emails, bank records and other witnesses buttressed their testimony*." David Kidwell, *Ex-City Official Guilty in Redflex Bribe Case,* Chicago Tribune, Jan. 27, 3016 at A8 (emphasis added). Further, the article stated: "'You wished there was a smoking gun, a picture of someone handing him the cash, and there wasn't,' [the juror] said, '*But it was so close to that.*'" *Id* (emphasis added).

Thus, according to the statements of the juror as reported in the article, far from finding the cooperating witnesses not credible, the jury found that their testimony was corroborated and supported by the plethora of additional evidence, as was clearly shown by the jury's verdict of guilty on all counts. And far from finding no connection between Bills and the conspiracy, the juror stated that the jury found that the evidence was "so close" to an actual picture of someone handing Bills the cash, which, again, is amply demonstrated by the jury's verdict.

Lastly, to the extent defendant uses the above article to challenge the credibility of any witness, "[i]t is axiomatic that, absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge." *Kuzniar*, 881 F.2d at 470; *see also United States v. Muskovsky*, 863 F.2d 1319, 1324

(7th Cir. 1988) ("These matters [of credibility and bias] affect only the witnesses' credibility and, as such, are solely for the jury to evaluate.") (citation and quotation marks omitted). The jury viewed these witnesses first-hand, judged their tone and demeanor, and heard their testimony, which they credited through their verdict. Defendant has provided no reason to set aside that verdict.

> ii. The evidence established that defendant was a member of the conspiracy.

Defendant argues that the evidence may have proved that a conspiracy existed among Redflex employees, but not that defendant was a member of that conspiracy. (R.159, at 8). Defendant's argument is belied by the evidence.

"Once the government proves the existence of a conspiracy, the government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Van Daal Wyk*, 840 F.2d 494, 498 (7th Cir. 1988) (citations omitted). Here, the evidence was more than slight; it was overwhelming.

Defendant contends that the government "needed to produce evidence independent of the statements of the alleged conspirators to establish Bill's membership in a conspiracy." (R.159, at 13). To the extent defendant claims that the government must offer evidence other than the testimony of co-conspirator witnesses, he is wrong. While it is true that the government may not prove the existence of a conspiracy and defendant's participation in it by relying only on the proffered hearsay statements for which it seeks admission, *United States v. Harris*,

7

585 F.3d 394, 398-99 (7th Cir. 2009), the government may rely on *non-hearsay* testimony from co-conspirators to show defendant's participation in the conspiracy.

In this case, such non-hearsay testimony included the following: (1) Rosenberg's and Finley's testimony that defendant met with Redflex employees at the John Hancock building the night before the kick-off meeting to the pilot phase in February 2003; (2) Rosenberg's and Jimmy Johnson's testimony that defendant met with them at CDOT offices after hours the night before the final vote of the evaluation committee in about May 2003; (3) Rosenberg's testimony that he and other Redflex employees met with defendant in Los Angeles for a celebration dinner in about June 2003, following the evaluation committee's vote in favor of Redflex; (4) Finley's testimony that defendant met with Redflex employees in Arizona, where they drafted a subsequently-cancelled sole-source contract and eliminated any trace of who made the changes to the contract; and (5) O'Malley's testimony that defendant and he often met for lunch where O'Malley paid defendant cash. This evidence is not hearsay but is first-hand observations of those witnesses that support defendant's participation in the conspiracy.

Furthermore, any statement made by defendant at such meetings (or any other meeting) is likewise not hearsay, but a statement of a party-opponent and otherwise admissible under the Federal Rules of Evidence. *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Here, the co-conspirators recounted many statements by the defendant that showed him to be the architect of the bribery scheme. For example, Rosenberg testified that defendant approached him in Los

Angeles, saying that "it was time to make good" and asked for money in exchange for defendant's assistance to Redflex in getting and keeping Chicago's red light camera contract. Rosenberg further detailed how defendant provided inside information to Redflex over the years. O'Malley likewise testified that defendant sought him out after an Alcoholics Anonymous meeting, directed him to a potential job with Redflex, and advised O'Malley that they (defendant and O'Malley) would share the proceeds of O'Malley's salary. The non-hearsay testimony of these witnesses, standing alone, established beyond a preponderance of the evidence that defendant participated in the conspiracy.

But that's not all. The non-hearsay evidence of defendant's participation (and leading role) in the conspiracy was corroborated by other evidence, including:

- Bank records of O'Malley showing that he withdrew over $581,000 in cash from in or around 2006 until in or around 2011;
- Records of large cash withdrawals on eight occasions made by O'Malley within eight days of trips taken by defendant, during which credit card records show no credit or debit activity on behalf of defendant;
- Large cash expenditures made by defendant, including: (1) cash rental payments for an apartment for himself in the amount of approximately $28,000 from April 2008 until in or around mid-2011; (2) the cash purchase of a boat in the amount of $10,000 in the summer of 2005; (3) the cash purchase of a Mercedes in the amount of $12,500 on or about June 22, 2009; and (4) a $3,000 cash payment for Bills's retirement party at the Westin Hotel on June 8, 2011;
- Defendant's laundering of cash through third parties by asking colleagues and friends to incur credit card charges on their respective credit cards for large-ticket personal expenses, such as airline tickets, and then at the same time of the request or shortly thereafter, reimbursing those persons with cash;
- The temporal correlation of large cash withdrawals by O'Malley in relation to the aforementioned credit card charges by colleagues and friends on behalf of, and at the request of, defendant;

- Hotel and airline records of defendant and co-conspirators;
- Defendant's use of checks from O'Malley's business account to pay off debts defendant owed to third parties, totaling nearly $25,000;
- Redflex internal records, including expense reports and receipts, some of which expressly referred to defendant by name or Redflex's contract with the City of Chicago;
- Bank documents showing defendant's involvement in the financing of the Arizona condo and O'Malley's purchase of the condo;
- The testimony of defendant's sister that the condo appeared to belong to defendant; and
- The testimony of Jack Jarzynka that defendant toured his condo in Arizona and advised Jarzynka that he intended to buy it for his father-in-law – Martin O'Malley.

Defendant contends that this corroborative evidence proves nothing because it is "based on the interpretation of coconspirators." (R.159, at 13). He is wrong again. None of the evidence listed above required interpretation. And, to the extent any interpretation by the co-conspirators was offered, it was up to the jury to determine the credibility of the witnesses and their interpretations.

There is no question that the evidence established by a preponderance of the evidence that defendant participated in the conspiracy.

      iii.   <u>The co-conspirator hearsay statements introduced at trial furthered the conspiracy.</u>

Defendant contends that statements introduced by the government at trial were not made in furtherance of the conspiracy. (R.159, at 9-10).

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). The

"coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010). Given the government's "relatively low burden of proof on this issue," *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987), the Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement. *United States v. Herrero*, 893 F.2d 1512, 1527-28 (7th Cir. 1990), *abrogated on other grounds by United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990); *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, at *2-3 (N.D. Ill. Apr. 28, 2004) (collecting cases).

Defendant does not identify any specific statement introduced at trial that, he contends, did not further the conspiracy. Defendant instead generally and vaguely asserts that statements of co-conspirators offered at trial constituted the "mere retelling of conversations and emails by Redflex employees." (R.159, at 14). Defendant's motion should be denied for this reason alone.

Nonetheless, as detailed in the government's *Santiago* proffer and as established at trial, the co-conspirator hearsay statements clearly furthered the conspiracy. For example, emails among Redflex employees with respect to the Chicago contract, many of which mentioned defendant specifically and identified actions taken by him on behalf of Redflex or certain steps that Redflex planned to take in the future, furthered the conspiracy by, among other ways, identifying other members of the conspiracy and their roles, *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); *United States v. Roldan-Zaoata*, 916 F.2d 795, 803 (2d Cir. 1990);

11

and keeping coconspirators advised as to the progress of the conspiracy, *United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987). These emails, among other co-conspirator statements, were part of the ordinary "information flow" by and among conspirators and served to inform members about the current status of the conspiracy. *United States v. Hunt*, 272 F.3d 488, 495 (7th Cir.2001).

        iv.    <u>Defendant's confrontation clause rights were not violated by the admission of co-conspirator statements of a witness who did not testify.</u>

Lastly, defendant asserts that the introduction of statements made by co-conspirator Bruce Higgins, the former CEO of Redflex, either through other persons or as documented in emails, violated the Confrontation Clause because the government did not call Higgins as a witness and defendant did not have the opportunity to cross-examine him. (R.159, at 10-11). The Seventh Circuit has rejected this argument. *See United States v. Jones*, 314 F. App'x 883, 886-887 (7th Cir. 2009) (citing *United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007) ("Statements of a coconspirator are not testimonial because they are considered party admissions, not hearsay.")).

        2.    *The Court Did Not Err by Denying Defendant's Motion for Change of Venue Due to Pre-Trial Publicity.*

Defendant contends that he is entitled to a new trial because the Court erroneously denied his pre-trial motion to change venue as a result of pre-trial publicity, which, he contends, violated his Sixth Amendment right to a fair and

impartial jury. (R.159, at 12-14). The Court properly denied defendant's pre-trial motion for change of venue, and his argument fares no better post-trial.

As the government set forth in its response to defendant's pre-trial motion for change of venue, these sorts of motions are disfavored: "pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554 (1976); *Willard v. Pearson*, 823 F.2d 1141, 1146 (7th Cir. 1987) ("Extensive pretrial publicity does not, in itself, render a trial unfair and violate a defendant's right to due process."). A transfer is warranted under Rule 21(a) if "extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (citation omitted). "Prejudice can be established by either a showing of actual prejudice, for example, when jurors can be shown to have exposure to pretrial publicity that prevents them from judging the case impartially, or by presumed prejudice, which occurs in cases surrounded by a 'carnival atmosphere,' where 'pervasive and inflammatory pretrial publicity' makes juror bias inevitable." *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007) (citation omitted). While it is not clear whether defendant contends his case suffered from actual or presumed prejudice, he has established neither.

Defendant mentions that three articles appeared in the Chicago Tribune from the time the Court denied his motion for a change of venue (June 12, 2015) to the first day of trial (January 11, 2016), specifically highlighting an article that appeared on the first day of trial. (R.159, at 13-14). Though he says that "this is but

13

one article" and he claims that "coverage of Bills and the government's allegations against him had been ongoing for more than a year," (*id.* at 14), he does not describe or quantify this coverage. The government is not aware of pervasive and inflammatory pretrial publicity for more than a year prior to trial, and the defendant's motion does nothing to bring such alleged publicity to light. Three articles in six months, or even five times that, does not a "carnival atmosphere" make. *See Nettles*, 476 F.3d at 513. Thus, he has not shown presumptive prejudice.

Nor has he shown actual prejudice. In this post-trial phase, the Court enjoys the benefit of having viewed first-hand each potential juror and can therefore make a determination as to whether any juror harbored or voiced actual prejudice. Defendant does not point to a single specific juror (or even potential juror) who had "exposure to pretrial publicity that prevent[ed] [him or her] from judging the case impartially." *Id.* at 513. While some jurors acknowledged during *voir dire* that they heard or read about the case, "juror impartiality [does not] require ignorance of the circumstances surrounding the charged activity." *United States v. Bills*, 93 F. Supp. 3d 899, 902 (N.D. Ill. 2015). In point of fact, the Court struck for cause several potential jurors (with agreement of the government) who voiced any semblance of bias against defendant as a result of pretrial publicity and/or other prejudices.

Furthermore, the Court managed the jurors' exposure to media effectively in order to prevent actual prejudice during trial through repeated instructions that they were not to discuss the case with each other or with friends and family members, or read about the case on news outlets or social media. No juror gave any

14

hint of harboring actual prejudice resulting from publicity, and the defendant has shown nothing to the contrary.

The Sixth Amendment guarantees a jury trial by a fair and impartial jury, and that is exactly what defendant received.

## CONCLUSION

Based on the foregoing, the government requests the Court DENY defendant's consolidated post-trial motions.

    Respectfully submitted,

    ZACHARY T. FARDON
    United States Attorney

By:   /s/ Timothy J. Storino
    ZACHARY T. FARDON
    LAURIE BARSELLA
    TIMOTHY J. STORINO
    Assistant United States Attorneys
    219 S. Dearborn Street, Suite 500
    Chicago, Illinois 60604
    (312) 353-5300

Dated: March 28, 2016