UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

    v.

JOHN BILLS

14 CR 135-1

Honorable Virginia Kendall

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING
MEMORANDUM AND SENTENCING RECOMMENDATION**

The United States of America, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant John Bills's sentencing memorandum (R.194).

## I. DEFENDANT'S FACTUAL OBJECTIONS TO THE PSR

The defendant makes several factual objections to the PSR:

- Paragraph 29: defendant objects to the probation office's characterization that he has been "generally compliant" while on pretrial release. (R.194, at 12). The government takes no position and defers to the probation office's discretion as to defendant's compliance while on pretrial release.

- Paragraphs 30-51: defendant objects generally to the "Offense Conduct" as recounted in the PSR. (R.194, at 12). In light of the evidence introduced at trial, this objection should be overruled.

- Paragraph 52: defendant objects to the government's victim impact statement in its version of the offense and, specifically, the impact of defendant's criminal conduct on the citizens of the city of Chicago. (R.194, at 12). The government stands on its victim impact statement and reiterates that defendant's criminal conduct has had, and will continue to have, lasting effects on the citizens of the city of Chicago by, among other things, eroding the public's faith in the possibility of honest city governance.

## II. DEFENDANT'S OBJECTIONS TO THE ADVISORY SENTENCING GUIDELINES RANGE

Defendant raises several specific objections to the advisory custody Guidelines range, which the government addresses in turn below.

### A. Loss amount (Guidelines § 2C1.1(b)(2))[1]

Defendant contends that the government's loss calculation is incorrect because he did not accept $680,107 in bribes and benefits. (R.194, at 13). In support, defendant argues that the loss calculation relies on the testimony at trial of Aaron Rosenberg and Martin O'Malley, which was not believable. (*Id.*).

Defendant's argument lacks merit. After two weeks of trial, the jury convicted Bills of soliciting and accepting cash bribes and other benefits. In doing so, the jury credited the testimony of Rosenberg and O'Malley, and moreover, their testimony was corroborated by other evidence admitted. For example, the government introduced O'Malley's bank records, which showed a consistent withdrawal of cash over the life of the conspiracy, which corroborated his testimony as to how the scheme worked. The government introduced emails between Bills and O'Malley, in which Bills instructed O'Malley (sometimes in code) how much in bribe money to bring to him at their lunch meetings, including an email on June 7, 2011, in which Bills suggested lunch at Shaller's and noted that the "8 page speed

---

[1] In its sentencing memorandum, the government proposed alternative loss amounts, specifically, (1) defendant's gain from the offense, which amounted to approximately $680,000 and corresponds to a 14-level increase to the base offense level; and (2) the total amount of money paid to O'Malley from Redflex, which amounted to approximately $2,032,959.50 and represents the reasonably foreseeable pecuniary harm resulting from the offense, corresponding to a 16-level increase to the base offense level.

overview can be discussed at lunch if your schedule permits." The "8 page speed overview," according to O'Malley, referred to Bills's request for a cash payment of $8,000.

The government also introduced records and testimony regarding defendant's lavish spending habits, often coinciding with cash withdrawals from O'Malley. For example, bank records showed that O'Malley withdrew $7,000 in cash on June 19, 2009, and an additional $3,500 in cash on June 22, 2009. Bills then purchased a used Mercedes for $12,500 in cash on June 22, 2009. The government also introduced testimony and records corroborating O'Malley's testimony with respect to the Arizona condo, including (1) bank documents showing defendant's involvement in the financing of the Arizona condo and O'Malley's purchase of the condo; (2) the testimony of defendant's sister that defendant said the condo belonged to defendant; and (3) the testimony of Jack Jarzynka that defendant toured his condo in Arizona and advised Jarzynka that he intended to buy it for his father-in-law – Martin O'Malley.

Defendant points to statements made by a juror to the media after the trial ended, which he contends supports his argument that the testimony of Rosenberg and O'Malley is not to be believed. (R.194, at 14).[2] Of course, these post-trial statements made by a juror to the media are not evidence, and even if they were, the entire quotation from the juror merely makes the government's point: "Jurors

_____

[2] Defendant made a similar argument in support of his post-trial motion to overturn the verdict.

didn't like that prosecutors relied so heavily on three key witnesses who had won deals, [the juror] said, *but emails, bank records and other witnesses buttressed their testimony*." David Kidwell, Ex-City Official Guilty in Redflex Bribe Case, Chicago Tribune, Jan. 27, 3016 at A8 (emphasis added). The article further stated: "'You wished there was a smoking gun, a picture of someone handing him the cash, and there wasn't,' [the juror] said, '*But it was so close to that*.'" *Id* (emphasis added).

Defendant's argument challenging the loss amount fails.

B.    High-Level Decision-Making or Sensitive Position (Guideline § 2C1.1(b)(3))

Defendant contends that he did not hold a high-level decision-making or sensitive position, and therefore, he should not receive four additional points under Guideline § 2C1.1(b)(3). (R.194, at 14). In support, Bills notes that he was not an elected official and did not hold a sensitive position, and he did not have decision-making authority or "the ability to approve the Redflex contract." (R.194, at 15). Defendant's argument imposes a higher standard for the application of the high-level decision-making enhancement than what is required.

The Guidelines define a high-level decision-making or sensitive position as a "position characterized by direct authority to make decisions for, or on behalf of, a government department, agency, or other entity, or by a substantial influence over the decision-making process." USSG § 2C1.1 app. n. (4)(A).

Defendant directs the Court to *United States v. Tomblin*, 46 F.3d 1369 (5th Cir. 1995). There, the defendant – a former aide to a United States senator –

appealed the sentencing court's application of what was then an eight-level enhancement because the defendant occupied a sensitive position.[3] *Id.* at 1391. The Fifth Circuit noted (and Bills highlights here) that "the exercise of some discretion alone does not mandate finding that the possessor of that discretion occupies a sensitive government position." *Id.* The government does not disagree with that statement as a general matter, but the facts and eventual outcome of *Tomblin* are also instructive. The Fifth Circuit went on to reject Tomblin's argument that as a "mere aide" he did not possess the requisite level of discretion or responsibility. *Id.* ("A senator's top administrative aide holds a position of substantial influence, because he often serves as the senator's functional equivalent."). The same is true for Bills – as an assistant commissioner at CDOT (2001-06), then an assistant director at OEMC (2007-10), and ultimately as the managing deputy commissioner at CDOT (2010-11), Bills at all times headed the City's digital automated red light enforcement program, commonly known as DARLEP. Bills served as a voting member on the 2003 DARLEP evaluation committee, and voted in favor of Redflex. Bills, by way of his position, retained the authority and discretion to make decisions in relation to the DARLEP program.

Bills points out that all "seven members agreed that Reflex was the best choice and ultimately signed off on offering Redflex a contract." (R.194, at 15). The fact that Redflex won the 2003 RFP unanimously does not diminish Bills's decision-

---

[3] Bills acknowledges that *Tomblin* addressed a prior version of the Guideline, which calls into question *Tomblin*'s continued viability.

making authority. Nonetheless, the evidence also established that Bills manipulated the process to encourage his fellow committee members to vote for Redflex. In particular, the night before the committee's final vote, Bills and Rosenberg went to the CDOT offices and reviewed red light photographs taken by Redflex and ACS during the pilot phase. Bills and Rosenberg cherry-picked photographs that showed Redflex's equipment working well and ones that showed ACS's cameras working poorly, and planned to show these photographs to the evaluation committee the next day. In addition, Bills wrote out the names of the members of the committee on placards and placed them around the table in the room, arranging the seating in a way to control the voting order and putting committee members who he (Bills) knew would vote for Redflex first so that their vote would influence other members. In this way, among other ways, Bills stacked the deck against the competition and in favor of Redflex.

Throughout the nearly 10 years that Redflex held the contract for DARLEP, Bills played a critical role in decisions affecting DARLEP. During the City's negotiations with Redflex of the original DARLEP contract, it was Bills who objected to the strict liquidated damages provision, and based on his objections, the strict provisions were softened, contrary to the advice of the City's attorneys. Further, years later, in a conversation with Rosenberg when the Redflex contract was at its peak, which conversation Rosenberg surreptitiously recorded, Bills boasted about the increase in the number of cameras that he was spearheading to the financial benefit of both Redflex and himself.

Defendant erroneously conflates *final* decision-making authority with *high-level* decision-making authority. (R.194, at 16) (asserting that testimony established that Bills lacked the authority to approve a contract and he "was not involved in the final approval of the contract"). The fact that defendant did not possess ultimate authority to approve a contract or unilaterally appropriate money to a private company does not prohibit the application of the enhancement here. Under defendant's reading of the Guideline, this four-level enhancement would be limited to mayors, presidents, and CEOs. Instead, the application note refers to a "position characterized by direct authority to make decisions," not necessarily the final decision. The evidence showed that Bills held multiple positions within the city of Chicago, all of which were "characterized by direct authority to make decisions" regarding DARLEP, and that Bills, in fact, made such decisions.

C.   Leader/Organizer (Guidelines § 3B1.1)

Defendant contends that he should not receive any role enhancement under Guidelines § 3B1.1. (R.194, at 17). Defendant asserts that the conspiracy did not involve five or more participants, and regardless, the entire scheme was devised by Rosenberg and he was "merely a pawn which Rosenberg attempted to manipulate." (R.194, at 18). These claims ignore the evidence and strain credulity.

Guidelines § 3B1.1 authorizes a four-level enhancement if the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," or alternatively, a three–level enhancement if the defendant was "a manager or supervisor (but not an organizer or leader) and the

criminal activity involved five or more participants or was otherwise extensive."[4] USSG § 3B1.1(a)-(b).

First, the conspiracy involved at least five or more participants. As the government alleged in the indictment and in its *Santiago* proffer, and as the evidence at trial confirmed, the conspiracy involved Bills, Rosenberg, O'Malley, Karen Finley, and Bruce Higgins, the CEO of Redflex from 2001-05.

Second, the evidence showed that Bills was an organizer and leader in the conspiracy and exercised direct control over other participants, most prominently, O'Malley. The evidence at trial established that Bills directed O'Malley throughout the conspiracy, including (1) directing O'Malley to look for an advertisement in the Chicago Tribune for a job with a red light enforcement company and directing him to apply for the job, which he did; (2) negotiating O'Malley's contract with Redflex on behalf of O'Malley; (3) informing O'Malley how they (Bills and O'Malley) would share the proceeds of O'Malley's compensation from Redflex, specifically, how O'Malley would retain his monthly salary and O'Malley would pass along the compensation from bonuses and commissions to Bills; and (4) directing O'Malley to buy a condominium in Arizona for Bills's personal use, and then directing O'Malley to cover their tracks, by buying picture frames and putting photographs of O'Malley's family in the condo in order to lead law enforcement to believe that the property was for O'Malley's use, and not for Bills.

---

[4] The government contends that the 4-level increase applies here; however, the probation officer determined that the three-level increase applies. (PSR, at ¶¶67-69).

Bills also directed other members of the conspiracy. It cannot be overlooked that Bills masterminded the scheme to defraud over drinks with Rosenberg after Redflex won the initial RFP in 2003. During that conversation, Bills gave Rosenberg (and Redflex) two options as to how they could pay him kickbacks, either (1) using a subcontractor as a corrupt pass-through, or (2) using a new Redflex customer service representative in Chicago. Redflex agreed and took the second option provided by Bills, hiring O'Malley as their customer service representative specific to the Chicago contract. Bills's direction and advice to Redflex and its executives continued throughout the life of the conspiracy as demonstrated by the testimony of Rosenberg and Finley; the internal Redflex emails, in which Redflex executives discussed information they received from Bills in furtherance of the scheme; and Finley's own handwritten notes regarding telephone conversations with Bills. The evidence at trial established that there was one leader and organizer of this corrupt endeavor: Bills.

Additionally, defendant's role was not just that of a manager or supervisor. *See* USSG § 3B1.1, cmt. n.4 (discussing factors distinguishing between the leadership/organizer enhancement from the manager/supervisor enhancement, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others"). Bills's criminal conduct checks all of

9

the above boxes: he exercised decision-making authority, as articulated above; he not only participated in the offense, but he instigated and oversaw the scheme throughout the life of the conspiracy, whereas the other four participants held narrower roles; he recruited accomplices, including O'Malley; and he planned and organized the offense from the very beginning, as demonstrated by how Bills pushed the Chicago contract to Redflex in the winter and spring of 2003 while, at the same time, directing O'Malley to seek and obtain a job with the same company. The nature and scope of the illegal activity – conspiracy that stretched over 10 years involving public contracts worth over $100 million – further supports the four-level enhancement for Bills.

Accordingly, pursuant to Guideline § 3B1.1(a), defendant's offense level is increased by four levels because defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise co-extensive. (PSR, at ¶¶67-69).

## III. SENTENCING RECOMMENDATION AND FACTORS UNDER 18 U.S.C. § 3553(A)

John Bills exploited the public trust to line his own pockets. He did so repeatedly and proactively over the course of about a decade. Since being caught, he has shown no remorse or contrition. He is thus deserving of a significant term of imprisonment.

Because of the loss calculations, Bills's Guidelines range is unusually high, even among significant public corruption cases. While the loss aspect of this case is significant, in the government's view, that factor need not so significantly dwarf the

other aspects of the crime. Even if the Court accepted defendant's loss calculation, (R.194, at 14) (asserting that a loss of $42,900 provides for a 6-level increase), the high end of Bills's Guidelines range would be just over ten years. The government thus recommends that this Court consider ten years as a floor and impose a sentence of at least ten years' imprisonment. Such a term would be sufficient but not greater than necessary to comply with the factors set forth in Title 18, United States Code, Section 3553(a). The government will address any remaining arguments raised by Bills, for example, those related to the factors under Title 18, United States Code, Section 3553(a), at the sentencing hearing.

<div style="margin-left: 40%;">

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:  */s/ Timothy J. Storino*
ZACHARY T. FARDON
LAURIE BARSELLA
TIMOTHY J. STORINO
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

</div>

Dated: August 15, 2016

11