**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 CR 135-1 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| John Bills | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

For the reasons set forth below, Defendant John Bills's Motion to Reconsider is denied.  (Dkt. No. 219.)

**STATEMENT**

On January 26, 2015, a jury convicted Bills ontwenty counts, including participating in a scheme to defraud the City of Chicago ("City") of the intangible right to honest services.  On February 22, 2016, Bills filed his consolidated post-trial motions.  (Dkt. No. 159.)  The Government responded to the motions on March 28, 2016.  (Dkt. No. 167.)  Bills's sentencing, originally set June 20, 2016, was then moved to September 2, 2016 pursuant to Bills's own request for additional time, and was ultimately reset to August 29, 2016 by agreement of the parties.  (Dkt. No. 198; Dkt. No. 204.)  The Court denied Bills's consolidated post-trial motions in their entirety on August 22, 2016.  (Dkt. No. 215.)  Now, in the eleventh hour and only one business day before his sentencing, Bills moves the Court to reconsider its Order based on *McDonnell v. United States*, 136 S. Ct. 2355 (2016), a decision that was handed down on June 27, 2016, nearly two months ago.  *McDonnell* was pending before the Supreme Court since January 15, 2016 and the petition for writ of certiorari was fully briefed on December 21, 2015.  McDonnell filed his opening substantive brief on February 29, 2016, all briefing in the case was completed on April 13, 2016, and oral argument was held on April 27, 2016.  Despite having access to the substantial briefing and arguments on the issue presented in *McDonnell* throughout the post-trial proceedings (and certainly being aware of the issue being presented to the Court prior to that time), Bills now raises this argument for the first time on this very late date.  Regardless of this

late filing, an analysis of *McDonnell* and the facts of this case show that the jury's verdict was sound both then and now.

In *McDonnell*, the Supreme Court addressed the interpretation of the term "official act" for federal bribery crimes. *Id*., No. 15-474, slip op. at 13. In that case, the Government indicted former Virginia Governor Robert McDonnell and his wife, Maureen McDonnell, on bribery charges related to the McDonnells' accepting $175,000 in "loans, gifts, and other benefits" from Jonnie Williams, a Virginia businessman who ran a company specializing in nutritional substances. *Id*. at 8. Pursuant to 18 U.S.C. § 201(a)(3), the Government was required to prove that McDonnell committed (or agreed to commit) an "official act" in exchange for the benefits.[1] The indictment alleged that Williams bribed McDonnell in exchange for five official actions, including the arranging of meetings with state officials regarding Williams's products, hosting events, such as a product launch, at the Governor's Mansion, allowing Williams to invite prospective business partners to the exclusive events at the Mansion, and recommending that government officials meet with Williams's company to discuss its products. After being convicted and having his appeal denied by the Fourth Circuit, McDonnell appealed to the Supreme Court arguing, among other things, that the Government's definition of "official acts" was overly broad. The Government argued that McDonnell's setting up meetings and telephone calls, in addition to other acts, all qualified as "official acts" under Section 201(a)(3). The Court rejected that reading as too broad, observing that an "official act" has two requirements: first, that an official act must involve "a formal exercise of governmental power" and that "a typical meeting, telephone call, or event arranged by a public official" could not qualify as a "cause," "suit," "proceeding," "controversy," "question," or "matter" as provided in Section 201(a)(3). *Id*. at 14-16. Turning to the second requirement, the Court determined that a "decision or action on" such a question or matter, when construed in light of the terms "pending" and "may be brought by law," required that the official duty be "relatively circumscribed" or related to "specific duties of an official's position." *Id*. at 17. In sum, the Court held that:

> To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.

*Id*. at 21.

Bills contends that the Government failed to provide sufficient evidence that any of the alleged bribes that Bills received from Redflex were made in exchange for an "official act" as defined in *McDonnell*. (*See* Dkt. No. 219 at 4-5.) Bills specifically argues that the Government failed to "prove the question, matter, cause, suit, proceeding, or controversy, which was influenced by these favors and gifts." *Id*. at 5. However, as the Court discussed at length in its Order denying Bills's post-trial motion, the Government put forth substantial evidence linking Bills's receipt of

---

[1] Section 203(a)(3) defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."

benefits to his active support of Redflex, thus meeting the "formal exercise of governmental power" requirement in *McDonnell*. For example, the Government's evidence at trial showed that:

- Bills received sample RFPs and ordinances from Redflex employees and then began to receive impermissible benefits from Redflex during the time that Redflex's contract proposal was pending. (*See* Dkt. No. 215 at 7-8.)
- Bills, during the RFP process and in return for the benefits he received, worked with Rosenberg and Higgins to "develop and codify elaborate, accurate, and articulated responses," to the Selection Committee's questions to exemplify Redflex's strengths while highlighting competing applicant companies' weaknesses. (*Id*. at 11-12; Dkt. No. 94 at 21.)
- As a member of the Selection Committee, Bills not only influenced other committee members to vote for Redflex proposal, but voted in favor of Redflex himself, all the while receiving money, hotel stays, and other benefits from Redflex. (Dkt. No. 220 at 5; *see also* Dkt. No. 220 (detailing litany of benefits that Bills received).)
- Bills caused the City, not only through assisting Redflex during the negotiation process but also by influencing other officials, to execute a contract with Redflex that included a liquidated damages cap that, according to the City's own attorney, was against the City's interest. (Dkt. No. 215 at 8.)
- After Redflex won the contract, Bills continued to work on behalf of Redflex, including by championing Redflex's bid for a sole source contract. The jury not only heard testimony regarding Bills's deliberate, official acts in relation to the sole source contract, but also reviewed emails between Bills and Redflex executives discussing how Redflex could best proceed during negotiations. (Dkt. No. 220 at 6-7 (citing trial exhibits); *see also* Dkt. No. 94 at 25-29.)
- In 2007, Bills continued to exert influence on the Selection Committee to choose Redflex for another RFP. In doing so, he also submitted Redflex's own RFP language to the Committee, again benefitting Redflex. (*Id*. at 8.)
- From approximately 2008 to 2011, Bills actively worked to not only push through legislation beneficial to Redflex, but he also worked to undermine Redflex's competitors. (*See* Dkt. No. 94 at 44.)

While the evidence discussed here and in the Court's prior Order denying Bills's post-trial motions is a very small portion of the substantial evidence the Government presented to the jury at trial, all of the outlined evidence fits neatly within the *McDonnell* framework. For example, Bills's receipt and review of Redflex's RFPs in exchange for benefits, actions that played a part in ultimately causing the City to enter into an agreement with Redflex, certainly qualify as a "formal exercise of governmental power." Comparing the facts of this case with the facts in *McDonnell* further highlights this point. In that case, the Government alleged that McDonnell had committed five "official acts" in exchange for bribes: (1) arranging meetings for Williams with Virginia government officials; (2) hosting and attending events at the Governor's Mansion to the alleged benefit of Williams's company; (3) contacting government officials as part of an effort to encourage state research universities to initiate studies related to Williams's company's products; (4) promoting the company's products and allowing Williams to invite individuals to exclusive events at the Governor's Mansion; and (5) recommending that senior government

officials meet with the company's executives to discuss ways that the company's products could lower healthcare costs. *McDonnell*, No. 15-474, slip op. at 10. The Supreme Court found such allegations to be insufficient, holding that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—*without more*—does not fit that definition of 'official act.'" *Id.* at 21 (emphasis added). Here, not only did Bills set up meetings, he also actively assisted Redflex with its RFP by providing Redflex with insider information regarding the selection criteria and provided Redfex with invaluable insight on how to present its proposal, and then advocated to the City to accept the RFP by influencing other members of the Selection Committee and personally voting for Redflex's proposal. Later, he championed the inclusion of a liquidated damages clause that was detrimental to the City. Given that those actions are merely a subset of all of Bills's official acts, the Government provided ample evidence at trial that Bills received significant benefits and both agreed to and did in fact take numerous actions that ultimately caused the City to enter into an agreement with Redflex.

In addition, Bills's alleged official duties related only to Chicago's red light camera program, falling well within the Supreme Court's holding that the official duty at issue must be "relatively circumscribed." *Id.* at 17. Again, comparing the facts of this case to those in *McDonnell* proves instructive. There, the Supreme Court held that McDonnell's alleged official duty of promoting Virginia's economic development was too broad. *Id.* at 14-15. The Court's rationale was that an official act, as required by Section 201(a)(3), could not be construed so broadly as to catch everything from "workaday functions" to "fostering the economic development" of the state of Virginia. *Id.* Here, however, Bills's official duties in each of his roles were circumscribed solely to the oversight the installation and operation of red light cameras in the City. Specifically, from 2001 to 2006, Bills was an assistant commissioner at the Chicago Department of Transportation; from 2007 to 2010, he was an assistant director at the Office of Emergency Management and Control; and from 2010 to 2011 when he retired, he was the managing deputy commissioner at the Department of Transportation. (*See* Dkt. No. 220 at 5.) As the jury learned through substantial evidence during trial, in each of these capacities, Bills actively took numerous actions to Redflex's benefit in exchange for bribes, including voting for Redflex's RFP in 2003 as a member of the selection committee, participating in contract negotiations to Redflex's benefit, and then, after Redflex won the contract, working to expand Redflex's contract to a sole source contract. (*See id*. at 5-8.) As such, the Government's evidence all related to Bills's acts as an official participating in and overseeing the City's red light camera program. The jury's verdict was based on the substantial evidence presented by the Government related to that very specific role and therefore *McDonnell* does nothing to disturb that verdict.

Accordingly, John Bills's Motion to Reconsider is denied. (Dkt. No. 219.)


Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 8/29/16