UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MARTIN O'MALLEY

14 CR 135-2

Honorable Virginia Kendall

## GOVERNMENT'S SENTENCING MEMORANDUM

**I.     Introduction**

Defendant Martin O'Malley served a narrow yet vital role in the charged conspiracy: the bagman who shuffled cash kickbacks from Redflex Traffic Systems to co-defendant John Bills. In addition to his role as the middleman, O'Malley profited handsomely from the scheme, pocketing hundreds of thousands of dollars. O'Malley, however, also cooperated with federal law enforcement from the moment of his arrest, and has continued to do so to date, at all times providing truthful information about his role in the conspiracy and testifying against his co-conspirator and the leader of the conspiracy, John Bills. In doing so, O'Malley has taken responsibility for what he did and has demonstrated sincere remorse about his criminal conduct.

**II.     Factual Objections to the PSR**

The PSR provides that "Mr. O'Malley has been cooperative since the beginning of the investigation and has provided assistance with respect to the investigation and prosecution of this case and others involving Redflex." (PSR, at ¶20). O'Malley began cooperating when he was approached by law enforcement, not since the beginning of the investigation. The government proposes that the sentence read as follows: "Mr. O'Malley has been cooperative since he was approached by law enforcement and has provided assistance with respect to the investigation and prosecution of this case and others involving Redflex."

1

### III.   Advisory Custody Guidelines Range

O'Malley entered a negotiated plea of guilty to Count Fourteen of the indictment, charging him with conspiracy to commit federal program bribery, in violation Title 18, United States Code, Section 371. (R.60).

### A.   Base Offense Level, Chapter Two Specific Offense Characteristics, and Chapter Three Reductions

Pursuant to Guideline § 2C1.1(a)(1), O'Malley's base offense level is 12. (PSR, at ¶¶27-28).  Pursuant to Guideline § 2C1.1(b)(1), because the offense involved more than one bribe, the offense level is increased by 2 levels. (PSR, at ¶29).

Pursuant to Guideline § 2C1.1(b)(2), because the loss exceeded $6,500, the offense level is increased by the number of levels from the table in § 2B1.1. The probation office determined that O'Malley's base offense level should be increased by 14 levels because the loss was more than $550,000 and less than $1,500,000. (PSR, at ¶¶36). More specifically, the probation office determined that, while O'Malley received over $2 million in compensation from Redflex as part of the scheme, O'Malley passed along over $500,000 of that money to Bills and paid taxes on the whole amount.

The government respectfully disagrees with the probation office's loss calculation. Here, as O'Malley well knows, O'Malley received money from Redflex – over $2 million – and passed along over $550,000 to John Bills in cash kickbacks. The remainder of the money O'Malley either retained for himself, or used to pay for other benefits for Bills, such as the purchase and expenses related to the Arizona condo O'Malley purchased for Bills's use, and the writing of third-party checks O'Malley wrote at Bills's direction to pay various debts Bills owed. O'Malley was fully aware that he was employed by and received money from Redflex for the purpose of acting as Bills's bagman. Thus, the full amount that he received from Redflex, $2,032,959.50, was

2

reasonably foreseeable harm resulting from the offense, since the price that Redflex charged the City of Chicago for the red light camera contract could have been reduced by the amount of money paid to the bagman to funnel kickbacks to Bills. *See* USSG § 2B1.1 app. n. 3(A)(iv) (addressing "Reasonably Foreseeable Pecuniary Harm"). This amount is in line with the agreed-upon loss amount in the plea agreement that O'Malley reached with the government, and, thus, the base offense level should be increased by 16 levels because the amount of the loss was more than $1,500,00 and less than $3,500,000.

In contrast, rather than focusing on the loss/harm to the victim, which was reasonably foreseeable to O'Malley, the probation office focused on the gain to O'Malley. However, as stated in Application Note 3 to USSG § 2B1.1, which is referenced by Application Note 3 to USSG §2C1.1, a court only uses the defendant's gain when loss "reasonably cannot be determined." Here, because the reasonably foreseeable harm to the victim can be determined, as stated above, the defendant's gain/benefit is irrelevant. And so, factoring net benefit by subtracting out taxes paid is simply inapplicable.

Rather than focusing on what a person received or retained, loss addresses the amount taken from the victim. Paying taxes on the illegal kickbacks did not lower the loss amount. The City of Chicago was deprived of honest services and overpaid Redflex on its contract by no less than the $2 million that Redflex gave to O'Malley. What O'Malley did with the money thereafter does not make the victim any more or less whole. Therefore, O'Malley's decision to pay taxes on the illegal kickbacks – which he was required to do by law – does not lower the loss amount. Furthermore, rather than being magnanimous, paying taxes on the illegal kickbacks was part and parcel of the scheme. According to O'Malley himself, O'Malley and Bills agreed that O'Malley would paid taxes on the kickbacks as a way to hide their criminal conduct. If anything, paying

3

taxes on the illegal cash kickbacks simply furthered the scheme by disguising their criminal conduct and allowing it to go on longer.[1]

Pursuant to Guideline § 2C1.1(b)(3), defendant's offense level is increased by four levels because the offense involved a public official in a high-level decision-making or sensitive position. (PSR, at ¶¶37-39).

With respect to acceptance of responsibility under Guidelines § 3E1.1, O'Malley has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. A two-level reduction in the offense level is appropriate. (PSR, at ¶44). In accord with Guideline § 3E1.1(b), defendant also timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), defendant is entitled to an additional one-level reduction in his offense level. (PSR, at ¶45).

O'Malley's total offense level, therefore, is 31.

**B.     Criminal History**

O'Malley has no criminal convictions that garner any criminal history points. (PSR, at ¶53). Accordingly, O'Malley's criminal history points equal zero, which places him in criminal history category I. (PSR, at ¶53).

**C.     Advisory Custody Guidelines Range**

O'Malley's total offense level is 31, which, when combined with a criminal history category of I, results in an advisory sentencing guidelines range of 108 to 135 months'

---

[1] As a more practical matter, the difference between a 16-level loss increase or 14-level loss increase to the base offense level is moot because in either instance, O'Malley's Guidelines range reverts to the statutory maximum term of imprisonment, that is, 60 months.

imprisonment, in addition to any supervised release and fine the Court may impose. Pursuant to Guidelines § 5G1.1(a), because the statutory maximum sentence on the Count to which O'Malley pled guilty is five years' imprisonment, which is less than the minimum of the applicable guideline range, five years becomes the advisory custody Guidelines range.

## IV.    Restitution

The Mandatory Victims Restitution Act ("MVRA") provides that restitution will be ordered to any victim for "an offense against property under this title, including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA defines a victim as any person directly harmed by a defendant's criminal conduct in the course of a scheme, *United States v. Belk*, 435 F.3d 817, 820 (7th Cir. 2006); 18 U.S.C. § 3663A(a)(2), which may include a government agency, *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998). The City of Chicago is victim of the honest services and bribery offenses here. It contracted to pay Redflex over $120 million dollars in relation to the red light camera enforcement contracts that Bills corruptly steered to Redflex. By doing so, the City of Chicago was "directly and proximately harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

The proper amount of restitution owed to the City of Chicago is the amount wrongfully taken by the defendant. 18 U.S.C. § 3663A(b)(1)(B). Restitution under the MVRA is limited to situations the victim could have obtained under a civil suit. *United States v. Martin*, 195 F.3d 961, 968 (7th Cir. 1999) (providing that the MVRA "seeks to engraft a civil remedy onto a criminal statute, giving the victim of the crime the recovery to which he would have been entitled in a civil suit against the criminal and thus merely providing a procedural shortcut rather than imposing a heavier criminal punishment"). The government bears the burden of proof to establish the

5

restitution amount by a preponderance of the evidence, but the defendant bears the burden to demonstrate the financial resources of the defendant and the financial needs of his dependents. 18 U.S.C. § 3664(e).

In *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569 (2004), a commercial bribery case, the Seventh Circuit explained that the quantum of bribes paid "can be used as a minimum estimate of damages . . . on the theory that no one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to the amount of the bribe; and that additional revenue is, at least as a first approximation, an additional expense to the person whose agent was bribed." *Id.* at 576. There, Williams, a video games manufacturer, brought fraud claims against its suppliers, one of which was Arrow, charging them with having bribed one of Williams's buyers, Greg Barry. *Id.* at 572. James Garrity worked for Arrow, and passed the bribes on to Barry. *Id.* at 575. The jury returned a verdict in favor of Williams in the amount of $78,000, "the amount of the bribes that Garrity paid." *Id.* In addressing that award, the Seventh Circuit reasoned that Arrow, the bribe payor, "presumably jacked up its prices . . . to cover the cost of the bribes that it was paying . . . to swing business its way, as otherwise it would have lost rather than made money from brib[ery]." *Id.* at 576. Had it not been for the bribes, therefore, Arrow's prices to Williams would have been at least $78,000 lower "[s]o that amount is the minimum estimate of the loss to Williams caused by Arrow's bribing Barry." *Id.*

The Seventh Circuit's reasoning in *Williams Elec. Games* applies here. Redflex hired O'Malley as the conduit through which it would funnel money to Bills, and it paid O'Malley over $2 million in compensation. Just as Arrow did in *Williams Elec. Games*, Redflex "presumably jacked up its prices to [the City of Chicago] by at least [$2 million] to cover the cost of the bribes that it was paying [Bills through O'Malley] to swing business its way, as otherwise it would have

lost rather than made money from bribing him." In this way, the $2 million that Redflex paid to O'Malley as the bribe conduit to Bills represents a loss to the City of Chicago, specifically money that it would not have otherwise paid out to Redflex absent the scheme to defraud and bribery conspiracy.

As the evidence demonstrated at trial, Redflex paid O'Malley approximately 2,032,959.50.[2] The amount of money Redflex paid to O'Malley in the course of the scheme/conspiracy represents an overcharge or expense incurred by the City of Chicago, and therefore, a loss it is entitled to recoup through restitution.

Under the MVRA, upon determination of the amount of restitution owed to the victim, the Court shall consider in setting the schedule of payment (1) the financial resources and other assets of the defendant, (2) projected earnings of the defendant and (3) any financial obligations of the defendant. 18 U.S.C. § 3664(f)(2). "A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." 18 U.S.C. § 3664(f)(3)(A). Section 3664 also directs the Court to craft its restitution order pursuant to 18 U.S.C. § 3572, *id.* § 3664(f)(2), which provides that "[a] person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments." 18 U.S.C. § 3572(d)(i) (emphasis added).

---

[2] This amount is based on the total amount of money paid to O'Malley from Redflex (both biweekly compensation and commissions), as reflected in "Government Exhibit 303_MOM Redflex Checks," which the government introduced at trial.

According to the PSR, O'Malley has the financial resources to make a significant lump sum payment immediately towards restitution. While O'Malley has limited projected earnings, O'Malley has no dependents. Based on O'Malley's financial situation as detailed in the PSR, the government requests that the Court order O'Malley to make a one-time lump sum payment of $30,000 to $35,000 towards restitution, to be paid within 30 days of sentencing. This payment, while significant, still leaves O'Malley with reasonable resources to support himself during a term of probation or supervised release based on additional funds in his bank account, other assets, as well as his monthly social security income.

**V.      Title 18, United States Code, Section 3553(A) Factors**

      A.      <u>Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))</u>

While Bills recruited O'Malley into the scheme to defraud and directed him in terms of how the scheme was executed, O'Malley went along willingly until the end, even attempting to cover his tracks with respect to the use of the condo in Arizona. On the other hand, since his arrest, O'Malley has cooperated with law enforcement and testified in the trial of Bills. O'Malley's criminal conduct and role in the scheme must be balanced against his subsequent and extensive cooperation.

      1.      *What O'Malley Did*

When Bills approached O'Malley about a job with a red light enforcement company in early 2003, O'Malley, who needed the money, was immediately interested. O'Malley went to the interview in Arizona and thereafter accepted the position. Having done so, O'Malley also accepted the terms of the job as set by Bills: while O'Malley would retain his base compensation (approximately $60,000 per year), O'Malley would pass along his bonuses and commissions to Bills.

8

With the terms of their deal in place and O'Malley now working at Redflex as the customer service representative for the Chicago contract, Bills and O'Malley devised a plan by which O'Malley funneled to Bills a significant portion of the money that O'Malley received from his employment with Redflex. The scheme proceeded this way: O'Malley, as an independent contractor with Redflex, invoiced his work, both for his base compensation and commissions. When it came time to invoice for a commission, Bills provided the information (number of cameras installed and amounts per camera, for example) to O'Malley to be invoiced to Redflex for payment. Usually 30 days after an invoice, Redflex mailed a commission check to O'Malley at a post office box that he set up. O'Malley then deposited the checks into his business account – "MG OMalley and Associates."

With the cash in O'Malley's account, Bills and O'Malley would then set up lunch meetings, at which O'Malley gave Bills the kickbacks. Two of the most common meeting spots for lunch were Manny's and Shaller's Pump. Bills and O'Malley set up the meetings over email or phone; when doing so, Bills instructed O'Malley how much money to bring to the meeting, sometimes stating expressly how much money he wanted and sometimes speaking in code, saying things like, "I need a five-page report," or "I need a six-page report," to indicate that he wanted $5,000 or $6,000 in cash. O'Malley deliberately tried to avoid giving Bills $10,000 or more in cash at one time as he had been told that deposits and withdrawals of $10,000 would raise red flags.

Prior to these meetings, O'Malley took out thousands of dollars in cash from the bank, and paid it to Bills at the lunch meetings. The cash was usually in $100 denominations. O'Malley paid Bills in $1,000 increments. If O'Malley withdrew thousands of dollars in cash that was not an even thousand-dollar figure, O'Malley kept the overage. In other words, if O'Malley withdrew $4,300,

he kept $300 and gave the remaining $4,000 to Bills. From 2006 through and including 2011, O'Malley withdrew over $581,000 in cash, $557,000 of which he passed on to Bills.

In addition to cash, O'Malley funneled kickbacks to Bills in other ways, all of which he knew was illegal. O'Malley wrote checks off his account at Bills's request, usually for personal debts Bills owed or for campaign contributions Bills specifically requested. These checks totaled over $25,000. O'Malley also paid for meals, golf, and other personal expenses for Bills, which O'Malley expensed back to Redflex and claimed the reimbursement. O'Malley also went along with Bills's purchase of a condo in Arizona. While Bills selected the condo and used it almost exclusively, O'Malley paid for it as well as all the expenses, even though he visited it only three times. O'Malley and Bills then attempted to cover their tracks by making it look like the condo belonged to him (and not Bills) by placing photos of O'Malley's family around the condo.

O'Malley did these things because O'Malley understood, from Redflex executives, that his job was to keep Bills and the City of Chicago happy so that Redflex could maintain and expand its business with the City. En route to keeping Bills happy, O'Malley also enriched himself.

    2.    *O'Malley's Role in the Conspiracy*

O'Malley was a willing participant in the charged conspiracy, and he clearly understood what he was doing when he agreed to partake in criminal activity. O'Malley however served a role inferior to that of his co-defendants, both Bills and Karen Finley, the CEO of Redflex. O'Malley was the quintessential bagman, shuffling cash between the bribe payor (Redflex) and the bribe receiver (Bills). As the evidence at trial firmly established, the mastermind behind the conspiracy was not O'Malley, but Bills, who recruited and used O'Malley to further his criminal conspiracy. Bills employed O'Malley over the course of the scheme as the middleman, directing him to the position at Redflex through which Redflex subsequently paid kickbacks to Bills. Bills went so far

10

as to use O'Malley (and Reflex money) to pay off personal debts, make campaign contributions, and buy a condo in Arizona. While O'Malley went along and certainly profited from the scheme, he did not concoct this scheme. O'Malley instead was in a difficult financial position at the time Bills proposed his idea, and O'Malley seized that criminal opportunity when it presented itself.

###### 3. *O'Malley's Cooperation*

Upon his arrest by law enforcement, O'Malley cooperated almost immediately. O'Malley admitted his role, and he has continually and consistently acknowledged his criminal conduct without minimizing his involvement. It is important to note that, through his admissions, O'Malley implicated himself in a vast conspiracy spanning nearly a decade and including over $100 million in public contracts. It was not illegal for O'Malley to be hired by Redflex for a job for which he was not qualified. What was illegal was for him to act as a conduit for kickbacks to Bills, the City worker who supervised the Redflex contract. Thus, by admitting to the kickback scheme, O'Malley was hardly "saving his skin." Instead, he was implicating himself in a crime. O'Malley's cooperation with the government continued up to and including the trial of Bills, at which he testified credibly about what he did and what Bills did.

O'Malley's cooperation has been extraordinary and the government asks the Court to consider that cooperation in settling on a reasonable sentence.

## VI. Conditions of Supervised Release

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), as well as subsequent Seventh Circuit precedent, and in addition to the imposition of a sentence of a term of imprisonment, the government recommends the imposition of a term of supervised release of three years.

A.    Mandatory conditions

With respect to the mandatory conditions, the PSR recommended the following mandatory conditions, specifically that O'Malley: (1) "not commit another Federal, State, or local crime," (PSR, Mandatory Conditions, #1); (2) "not unlawfully possess a controlled substance," (PSR, Mandatory Conditions, #2); and (3) "cooperate in the collection of a DNA sample if the collection of such a sample is required by law," (PSR, Mandatory Conditions, #5). The government agrees with the imposition of these mandatory conditions. *United States v. Bryant*, 754 F.3d 443, 445 (7th Cir. 2014) (discussing the mandatory condition that a defendant must cooperate in the collection of a DNA sample, and explaining that "[s]ince it was mandatory, no reason needed to be given for its imposition").

B.    Discretionary Conditions

In addition to the mandatory conditions, the Court has discretion to impose additional conditions of supervised release (1) that are "reasonably related" to the factors set forth in 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); (2) that "involve[] no greater deprivation of liberty than is reasonably necessary" to meet the goals of 18 U.S.C. §§ 3553 (a)(2)(B), (a)(2)(C), and (a)(2)(D); and (3) that are "consistent with any pertinent policy statements issued by the Sentencing Commission." 18 U.S.C. § 3583(d); *United States v. Shannon*, 743 F.3d 496, 500 (7th Cir. 2014). Section 3583(d) points to the discretionary conditions set forth in § 3563(b).

Discretionary conditions 2, 5, 6, and 8, as numbered in the PSR, support defendant's rehabilitation and reintegration into the community. For example, discretionary condition #2 requires O'Malley to pay restitution, which is mandated under the statute. Repaying his debt to society will assist O'Malley in his rehabilitation. Discretionary condition #5 prohibits O'Malley from engaging in work similar to the conduct in the underlying offense. The government contends

this condition is appropriate here. While O'Malley must be free to make a living and support himself while on supervised release, the serious nature of the offense, and broad scope and length of the conspiracy, supports the imposition of this condition. Prohibiting O'Malley from obtaining a position that involves "consultation, contracting, referring or billing with the city of Chicago" eliminates a narrow class of potential employers, and allows O'Malley to still find and obtain employment in other fields.

Discretionary condition #6 directs defendant to refrain from communicating or meeting with persons he knows to be engaged in criminal activity. The Seventh Circuit has approved of the language similar to that recommended by the probation office here. *See United States v. Kappes*, 782 F.3d 828, 848-49 (7th Cir. 2015) (criticizing different language, specifically the vagueness of the word "associate," and recommending alternative language: "to meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity"). Discretionary condition #8 instructs the defendant to refrain from possessing a firearm, which he may not otherwise now do as he is a felon.

Discretionary conditions #14-18 in the PSR all serve a similar purpose, that is, facilitating the supervision of O'Malley by the probation officer. Requiring O'Malley to remain within the Northern District of Illinois[3] and reporting to a probation officer, for example, allow the probation officer to do his or her job of supervising O'Malley and ensuring his success on

---

[3] The Seventh Circuit in *Ortiz* also criticized this language. *Ortiz*, 2016 WL 1239198, at *1. Specifically, the Court stated, there is no definition of "jurisdiction" and "no reason to think that the defendant would understand what it meant and, if he correctly understood it to denote a geographical area, what the boundaries of that area are." *Id.* The government proposes amending this condition from "remain within the jurisdiction" to "remain within the Northern District of Illinois" because, in line with the complaints in *Ortiz*, it sufficiently defines the jurisdiction.

supervised release. (PSR, Discretionary Conditions, #14&15). These conditions likewise encourage O'Malley's compliance with the law and deter him from future crimes by keeping the defendant in contact with his probation officer. Discretionary condition #16 – allowing the probation office to visit defendant at various locations – is "reasonably related to rehabilitation and protecting the public from recidivism since it should allow probation officers to help [Bills] reintegrate into society after his time in prison and to ensure that he is abiding by the conditions of his supervised release." *United States v. Armour*, 804 F.3d 859, 870 (7th Cir. 2015); *see also Johnson v. United States*, 529 U.S. 694, 709 (2000) (describing supervised release as "the decompression stage" between prison and full release and noting that defendants may need help achieving "successful reintegration"). Discretionary conditions 14-18 are reasonably narrow and allow the probation officer to supervise O'Malley effectively. Effective supervision of O'Malley by the probation office will assist him in his rehabilitation and ensuring that his term of supervised release is completed successfully.

  C. <u>Special Conditions</u>

   Pursuant to 18 U.S.C. § 3563(b)(22), which allows for "other conditions as the court may impose," the probation office recommended numerous additional conditions.

   First, the probation office recommended a series of financially-related conditions, all of which the government addresses together. Specifically, the probation office recommended that O'Malley not open any lines of credit without approval, provide access to requested financial information, notify the Court of material changes in his economic circumstances, and provide tax documentation. (PSR, Special Conditions, #5-8). These conditions facilitate defendant's payment of court-ordered restitution thus assisting O'Malley in meeting the financial obligations imposed

14

by the Court. In the same vein, these conditions assist the probation office in monitoring O'Malley's ability to meet his financial obligations.

Second, the probation office recommended that O'Malley pay financial penalty that remains unpaid at the commencement of supervised release pursuant a payment schedule. (PSR, Special Conditions, #10). This condition, like the financial-related conditions above, assists O'Malley in meeting his court-ordered obligations.

Third, the probation office recommended that defendant "not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court." (PSR, Special Condition, #11). While the government contends that this condition is largely unnecessary here, as the Seventh Circuit has previously noted, "acting as a confidential informant is generally inconsistent with the rehabilitative and re-integrative goals of supervision." *Kappes*, 782 F.3d at 851 (finding that the district court's lack of findings to support this condition was harmless) (internal quotation and end citation omitted).

Fourth, the probation office recommended that, if the assigned probation officer determine that defendant poses a "risk to another person," the officer may require him "to tell the person about the risk, and [the defendant] must comply with that instruction." (PSR, Special Condition, #13). The government objects to this condition as unnecessary and vague.

## VII.    CONCLUSION

The government recognizes the damage done by O'Malley and his co-conspirators. Their egregious conduct cast a pall over Chicago government, and will continue to do so for some time. While Chicago is no stranger to corruption, the brazen nature of this conspiracy, the length of this conspiracy covering nearly 10 years, and the scope of the kickbacks paid to Bills ranging from cash to condos to campaign contributions all sets this case apart. On the other hand, O'Malley

acknowledged his criminal conduct upon arrest, never minimized what he did, and continued to cooperate with the government, up to and including his lengthy and credible testimony at trial against his co-defendant. In light of O'Malley's age and health conditions,[4] the government will assess O'Malley's ability to serve a custodial sentence at the time of sentencing but also acknowledges that, for all the reasons detailed above, leniency appears appropriate, including the possibility of home confinement or probation.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:    */s/Timothy J. Storino*
ZACHARY T. FARDON
LAURIE BARSELLA
TIMOTHY J. STORINO
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
Dated: August 29, 2016    (312) 353-5300

---

[4] The government does not detail O'Malley's health conditions here. *See* (PSR, ¶¶67-69).