## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | No. 14 CR 135 |
| | ) | Honorable Virginia Kendall |
| KAREN FINLEY | ) | |
| | ) | |
| Defendant. | ) | |

## KAREN FINLEY'S SENTENCING SUBMISSION AND REQUEST FOR A SENTENCE BELOW THE GUIDELINE RANGE

Karen Finley, by and through her attorneys, MONICO & SPEVACK, submits this Sentencing Submission along with the attached letters to aid the Court in imposing a fair and reasonable sentence in this case. The advisory guideline term of imprisonment is 60 months' incarceration. The U.S. Probation Officer determined that a sentence of 60 months is greater than necessary to achieve the goals of sentencing and recommends a below-guidelines sentence of 30 months, based in part on Ms. Finley's individual characteristics. We agree with the probation office that a below-guidelines sentence is supported by Ms. Finley's history and characteristics, but submit that a sentence of no greater than 14 months is the appropriate sentence.[1] This sentence would accomplish the statutory sentencing goals and is supported by: (1) Ms. Finley's extensive and significant cooperation (2) Ms. Finley's exemplary family, employment, and community history; (3) Ms. Finley's lack of criminal history; (4) Ms. Finley's unlikelihood of

---

[1] On October 20, 2016, Karen was sentenced to 14 months' imprisonment and one year of supervised release, in the companion Ohio case. The Ohio sentence was below both the advisory guideline range of 37-46 months' imprisonment and the probation officer's recommendation of 30 months' imprisonment. *U.S. v. Finley*, No. 15-CR -148 (S.D. OH.). Under Karen's plea agreement in both this case and the Ohio case, the parties have agreed that the sentence imposed by this Court will run concurrently with the sentence of imprisonment and supervised release already imposed in the Ohio case.

recidivism; (5) Ms. Finley's role in the offense; and (6) the collateral consequences of conviction.[2]

## I.  __INTRODUCTION__

Karen Finley got caught up in a bribery scheme at her company that she did not originate or benefit from.  Karen is profoundly remorseful for her conduct.  She apologizes to the Court, the Government, the public, and her family.  She pled guilty and cooperated with the Government.  She understands the gravity of her crime and accepts that she is going to jail. Considering her substantial cooperation and the mitigating factors discussed below, she asks the Court for a sentence of no greater than 14 months.

***

In October 1998, Karen Finley was an up and coming executive in the traffic systems industry when she took a job with American Traffic Systems (ATS) as the Director of Operations. It was a position that she earned after working in the insurance industry for 20 years, starting out as a clerk right out of high school and finishing as the Director of Operations at the Scottsdale Insurance Company in Arizona.  While at Scottsdale, Karen earned her college degree at age 39, something she had previously been unable to afford, and married her husband of 17 years, Tim Finley.

At her new job with ATS, Karen worked closely with ATS's president to manage the traffic safety business.  When Australian Company Redflex bought ATS's traffic safety business in 1999, Redflex rewarded Karen's diligence by promoting her to Vice President of Operations.

---

[2] To the extent this Sentencing Submission is subject to the 15-page limitation under Local Rule 7.1, it consolidates the Defendant's Response to the Government's Version, Defendant's comments on the PSR, the Defendant's Sentencing Memorandum, Defendant's Supervised Release Conditions, and the Defendant's Request for a Sentence Below the Guidelines.

In March 2006, Redflex's Board promoted Karen to President/CEO. Karen's family was very proud of her rise in the corporate world, especially since Karen did not earn a college degree until she was almost 40 years' old.

Karen's success was not without its dues. Redflex was a "toxic and negative environment" and the 14 years' she worked there "wore [Karen] down mentally" and robbed her of precious time with her family. (PSR ¶ 64). In addition to contentious struggles with a difficult boss and co-workers, Karen worked over ten hours a day and most weekends. She drank wine every night to deal with the stress. By 2011, Karen's doctor prescribed Wellbutrin for depression and anxiety after Karen reported "being overwhelmed with family, professional and social obligations" and difficulty sleeping, depressed mood, fatigue, loss of energy, poor concentration, and indecisiveness." (PSR ¶ 72).

These feelings and the turmoil at work came to a head in 2013 after Karen's younger sister, Kelly, died from a massive heart attack at age 50. Kelly's shocking death was a severe blow to Karen and her family. The day Kelly suffered the heart attack, Karen's father was in the hospital after suffering a heart attack himself a week earlier. Karen's mother suffered from neuromuscular degeneration and was in a wheel chair. They both lived in a nursing home in Arizona and could not get to Kelly. When Karen got the call that Kelly was clinging to life, Karen immediately flew to Colorado from Florida (where she was on a business trip), but did not make it in time to see Kelly before she died. Devastated, Karen sank into an even deeper depression causing her to "re-evaluate her employment situation" and immediately resign from Redflex. Making matters worse, around this same time, Karen's husband, Tim, was laid off from work and his mother died after a painful battle with cancer. (Exhibit 1, Tim Finley Letter). It was an incredibly challenging time and Karen spent most days taking care of her parents and her

3

widowed father-in-law. She hoped to eventually find a new job in a less "toxic" place that would allow her to work and take care of her family.

Just as the fog after Kelly's death began to lift a little, Karen was indicted in this case. Karen is profoundly sorry for her participation in the bribery scheme. She is angry at herself for lacking the strength to leave Redflex when confronted with the scheme. Even though Karen is still proud of her hard work, she understands that she was wrong when she "stopped thinking of herself as a CEO and just went along with what everyone wanted." This decision will haunt Karen for the rest of her life. While it was not a decision born out of greed, Karen understands that there is no justification for her conduct and she is terribly sorry for contributing "to the public's cynicism and mistrust of city government." (Id.). That is why Karen pled guilty and cooperated extensively with the Government in the Ohio Redflex case, this case - providing key testimony in the trial of John Bills -, and in an Australian investigation into Redflex Holdings, LTD., the publicly traded Australian parent company.

Now, instead of celebrating her years of hard work with the prospect of a well-earned and comfortable retirement, Karen, at age 57, is going to jail and facing financial ruin. Unemployed since the indictment two years ago, Karen even lost a minimum wage job at a bakery after her employer read about her case in the paper. While Tim is working again, he too was unemployed for about a year and a half, during which they used their savings to live. (Exhibit 1). With Karen not working and in jail, they will most likely lose their home.

Despite living under the "dark cloud" of shame and fear, Karen tried to stay productive by volunteering her time and energy to save abandoned dogs from euthanasia. Karen has also continued to be the primary family member caring for her 85-year-old father, who now suffers from dementia and is confined to a wheelchair. While he still lives in a nursing home, Karen

takes him to multiple doctor's appointments, runs his errands, visits with him frequently, and otherwise manages her father's care. Karen's mother died in July 2016 after suffering a stroke. The only comfort provided by her mother's death to Karen is that her mother did not have to see her go to jail.

Karen accepts that she is going to jail, but hopes for a sentence that will allow her to contribute to the community and continue caring for her father after she is released from custody. Under the facts of this case, we believe a sentence of no greater than 14 months' incarceration is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a) and will allow Karen to meet her goals.

## II.     KAREN FINLEY'S PERSONAL BACKGROUND

Karen submitted a statement concerning the offense that includes a detailed description of her personal background and her role in the offense. Additionally, the probation officer prepared a thorough summary of Karen's personal and family data. (PSR ¶57-86).

### A.  Early Life

Karen was born in Columbus, Ohio in 1959 and is one of three children born to Raleigh and Mary Jo Mabry. Karen's older sister, Kathryn, 58, lives in Phoenix, Arizona and is a project manager at a bank. Karen's younger sister, Kelly, is deceased. In 1972, the family moved to Denver, Colorado. After Karen's father lost his job in Denver, he descended into a period of unemployment, depression, and alcoholism, which ended after a six week stay at a rehabilitation facility. During this time, Karen's mother held down the fort, working as a clerk at an insurance company, but she too suffered from depression and anxiety. Despite the chaos of her high school years, Karen's family remained very close-knit.

### B.  Education and Profession

Karen graduated high school in Littleton, Colorado, in May 1977.  She wanted to go to college, but her parents could not afford the tuition.  She worked in retail for a short time and then her mother got her a job at the insurance company where she had worked as a clerk.  Karen stayed in the insurance industry for another 20 years, working as an account manager, from 1980 to 1992, at Traveler's Insurance in Chicago, Illinois and Denver, Colorado.  In 1992, Karen moved to Arizona, and began working as an underwriter at Scottsdale Insurance Company.  She stayed at Scottsdale until 1998, eventually getting promoted to Director of Operations.  While working full-time at Scottsdale, at age 39, Karen earned a bachelor's degree in business management from the University of Phoenix.  After that, Karen earned a Masters of Business Administration in Finance at Western University.  Karen also met her husband Tim at Scottsdale. They married in January 1999.  Tim currently works as a logistics consultant for hospitals.

In October 1998, Karen left Scottsdale and accepted a position as Director of Operations with ATS, where she was responsible for the operational staff and some customer relations.  In July 1999, Redflex, an Australian company, bought ATS's traffic safety business.  In 2001, Redflex promoted Karen to Vice President of Operations.  Karen reported directly to CEO Bruce Higgins, an Australian that Redflex hired to run the traffic safety business in the U.S. and Australia.  In December 2005, Higgins moved back to Australia and Karen took over as CEO on an interim basis.  In March 2006, the position became permanent. Karen resigned from Redflex in 2013 after the sudden death of her younger sister from a massive heart attack.

### C.  The Offense Conduct

As Karen admitted in her plea agreement, she participated in a scheme with Redflex and its representatives to give personal and financial benefits to John Bills in exchange for Bills' help in steering red light camera contracts to Redflex.  In 2002, Aaron Rosenberg, the Vice President of Sales and Marketing at Redflex, learned that that City of Chicago was interested in red light enforcement cameras.  Rosenberg contacted Bills and sent him sample RFPs and ordinances related to red light cameras.  In December 2002, the City issued an RFP for a red-light camera contract, followed by a pre-bid meeting for interested vendors in January 2003.  Shortly thereafter, Bills initiated a corrupt relationship with Redflex through his contacts Rosenberg and Higgins.  (Government's Version at 2).

Around February 2003, during a competition between Redflex and another bidder for a contract, Karen learned from Higgins and Rosenberg that Bills was "championing" Redflex within the City by providing pointers and inside information to Redflex.  In May 2003, after the City awarded Redflex the contract, Higgins' directed Karen to get involved in hiring Bills' friend, Martin O'Malley, as an independent contractor for Redflex.  Karen told Higgins that she thought O'Malley was not qualified for the job.  But, Higgins told Karen that O'Malley was Bills' friend, that Bills wanted Redflex to hire O'Malley and that it was important to keep Bills happy.  Higgins also told Karen that Redflex would eventually give Bills a job in return for his assistance in getting Redflex the contract.  In December 2003, at Higgin's direction, Karen signed O'Malley's employment contract.

Karen was not involved in conversations between Rosenberg, Higgins, and Bills during which Bills asked for money in return for helping Redflex win the 2003 contract.  Nor, was Karen involved in Bills and O'Malley's plan to funnel cash from O'Malley's salary to Bills.

However, during various times throughout her tenure at Redflex, Karen, despite her suspicions, willfully avoided learning whether O'Malley passed any of his salary to Bills and ignored questions by others about O'Malley's compensation. Similarly, Karen also refused to acknowledge the request of Redflex's comptroller to renegotiate O'Malley's compensation and, at Rosenberg's request, agreed not to pay O'Malley a bonus until after he (Rosenberg) talked to Bills about it. At the same time, Karen knew about and approved some of the benefits that O'Malley and Rosenberg expensed to Redflex on behalf of Bills, including airline tickets, car rentals, meals, and golf. Karen knew that it was improper to give these benefits to Bills, but she did not want to be the one to upset Bills or cause Bills to stop assisting Redflex in keeping and expanding business within the City. Despite Karen's knowledge of the benefits, in August 2007 and September 2008, Karen falsely certified on the City's economic disclosure forms that no agents of Redflex had bribed or attempted to bribe an employee of the City of Chicago.

### D. THE AFTERMATH

Kelly's death, the indictment, and years of working in a "toxic and soul sucking" environment plunged Karen into a deep depression. (Defendant's Version at 1). Overwhelmed by remorse and shame, "there were many days where [Karen] did not get out of bed or leave [her] house." Karen knew that she needed to make amends for her conduct. She started by cooperating with the government and pleading guilty. "Formally accepting responsibility for [her] conduct" gave Karen hope for the future and allowed her to regain a sense of herself. (Id.). As part of her substantial cooperation, Karen met with the Government whenever requested and helped "the Government with respect to the investigation and prosecution of this case and others involving Redflex." (PSR ¶24). With respect to Bills' trial, Karen travelled to Chicago four times and worked with the United States Attorney and others to prepare her testimony for trial.

Karen accommodated the United States Attorney's busy schedule even travelling to Chicago on short notice and a few days before Christmas 2015. Karen then testified for a full day in Bills' trial, coming back the next day for another hour and a half. Unquestionably, her important and credible testimony helped secure Bills' conviction.

Months after the trial ended, Karen continued her cooperation by providing the Australian Federal Police with a written statement about her employment at Redflex and Higgins' (an Australian citizen) participation in the bribery scheme. At the Government's request, Karen met with two Australian law enforcement officers for two days during which she reviewed her written statement with them and explained key documents and testimony from Bills' trial. The Investigating Case Agent reported to the probation officer that "Ms. Finley was cooperative with the investigation and prosecution of the instant matter and other cases and made no attempt to deny or minimize her involvement in the offense. (PSR ¶30). Further, per the Probation Officer, Karen continued to make amends for her conduct in that she "pled guilty in a timely manner, has been compliant on pretrial release, and was cooperative during the presentence investigation." (Id.).

In addition, during this dark period in her life, Karen also took care of her severely infirm parents and diligently tried to find employment. Finding a job was nearly impossible given the publicity of this case. After two years of unemployment, Karen got a minimum wage job at a bakery, which she enjoyed. Unfortunately, the bakery let her go after her case was reported in the newspaper a few weeks later. Karen then ramped up her volunteer work at a not-for-profit organization that finds homes for rescue dogs, where, because of her dedication, Karen is recognized as a passionate advocate for the care of abused animals. While Karen and Tim have

no children due to her fertility issues, they have four rescue dogs that are like members of their family.

### III.     KAREN'S CHARACTER LETTERS

Karen Finley is a hardworking woman, a loving wife and daughter, a supportive friend and a contributing member of the community.  Karen's family members, friends, and former co-workers have written letters to the Court which reveal Karen's true character.  Karen's husband of 17 years, Tim, calls Karen "the most generous, kind, and caring" person that he has ever met. (Exhibit 1).  Tim believes that Karen is not defined by this offense in that "she is not motivated by greed or a desire for material goods," but rather, she is "most happy when she is with family and her dogs."   Tim is very proud of Karen's efforts with rescue dogs and her involvement in the Arizona Weimeraner Rescue.  He is most grateful to Karen for her unselfish support to his family during his mother's illness and eventual death.  Even though Karen was the primary caregiver for her own "invalid parents," she also supported Tim's father during his wife's battle with cancer and death.  Tim knows that "there is nothing [Karen] regrets more in her life than not leaving Redflex sooner and participating in the conduct that led her before the Court."  Tim believes that Karen has learned a great deal from this case and is "confident that if ever faced with a situation like this again she would absolutely walk away."  Tim's greatest hope is that the Court gives Karen a second chance as she is the "cornerstone" of their family and without her they "will all be lost."

Tim's sister, Elyse Pickering, writes the same.  (Exhibit 2).  She calls Karen "the rock of the family" who "ensures that everyone is cared for."  Elyse witnessed Karen's selfless support for her brother and father during their mother's battle with cancer.  She credits Karen for bringing her closer to her brother and teaching her the importance of family.

Similarly, Karen's older sister, Kathryn Mabry, tells the Court that Karen is devoted to family, hard work, and volunteer work. (Exhibit 3). Knowing that Karen has always been "genuine, compassionate, and a good human being," Kathryn is certain that Karen "did not intend to harm anyone" by her conduct. Kathryn marvels at Karen's strength over the past few years as Karen was the primary caregiver for their infirm parents even though "Karen's soul was broken by Kelly's death and she has been living under the shame and fear of an uncertain future." Kathryn is grateful for Karen's help with their parents as her work schedule does not permit her much time outside the office. It gave Kathryn peace of mind to know that Karen was with their parents at doctor's appointments and "visit[ed] with them for hours on end to help them cope with the loss of their youngest child and the fearful and sometimes lonely life inside a nursing home." Kathryn is also proud of the way Karen took responsibility for her conduct and the "many steps that she has already taken to make amends for her conduct." Kathryn will never forget the pain the family suffered after Kelly's death. She prays for leniency for Karen, but also for her parents, because at this stage in their lives, "they cannot handle losing another daughter."[3]

Karen's father-in-law, Gordon Finley, is grateful to Karen for her crucial support after his wife died about three years ago. (Exhibit 4). Gordon understands that it is even more "remarkable" since at the time Karen was dealing with the death of her sister, the stress of this case, and her infirm parents. Having witnessed Karen's selflessness, Gordon strongly believes that Karen's intentions in going to Redflex were genuine and that "she worked hard every day with the goal of public safety in mind."

---

[3] Karen's mother died in July 2016, after Kelly wrote her letter.

John Wintersteen, a retired marine corps officer and police officer, agrees, telling the Court that "Karen Finley is personally and singly responsible for saving many lives in the United States of America." (Exhibit 5). John recalls how Karen's hard work and dedication at Redflex helped save a "crucial traffic safety program" for the Town of Paradise Valley, Arizona, when he served as its Chief of Police and Director of Public Safety. John knows that "as a career law enforcement officer it is somewhat of an anomaly for [him] to be writing a letter asking for leniency for a defendant." He believes that Karen is "worthy of [his] letter and plea for leniency" given that all her interactions with him were proper and ethical. Even knowing about this case, John "would gladly work with Ms. Finley again."

As would former Redflex office manager Sandra Stevens. (Exhibit 6). Despite her knowledge of this case, Sandra describes Karen as a "generous, patient, and kind person to work with." She remembers Karen's "exceptional dedication" to Redflex and the employees and how "Karen once even used her own personal credit card to ensure employees" would not miss payroll. For Sandra, Karen's selfless acts are what made her stand out in Redflex's "tough environment." Likewise, Sandra "believes that it was Karen's dedication that helped grow the company from 20+ employees to over 300."

One of these employees was Jennifer Dwiggins, who directly reported to Karen for over ten years. (Exhibit 7). During this entire time, Karen never once asked Jennifer "to do anything that made [her] uncomfortable or that [she] felt was wrong." Karen was not only "an excellent boss," but she was also a "dedicated worker… who put her heart and soul into the success of the company." Jennifer recalls how Karen effectively juggled customer satisfaction, safety concerns, employee needs, and Board requests. Jennifer hopes that the Court considers Karen's role at the company outside of her conduct in this case and that she "is a good and kind person."

Rebecca Kapp has known Karen since 2010 through the Arizona Weimeraner Rescue and offers the Court a different perspective. (Exhibit 8) She believes that Karen's "dedication to the organization and her compassion towards the dogs, especially the senior dogs, reflects on Karen's excellent character as a human being." Over the years, Karen has fostered many dogs that do not get adopted because of their age, held fundraisers at her home to raise funds for medical expenses for sick dogs, and even paid veterinarian bills out of her own pocket. For Rebecca, Karen is "one of the organizations biggest assets" in that she is "reliable" and "always willing to help no matter what the task." Jennifer believes that the organization will be at a great loss without Karen and there "will certainly be a noticeable decline in the number of dogs we can save from being euthanized." She hopes for a sentence that will allow Karen to return to the organization soon.

Amy Wolff hopes for the same. (Exhibit 9). She met Karen about four years ago through the rescue organization and now they are close friends. She too has witnessed Karen's unique dedication to saving dogs from euthanasia and finding them safe homes. Amy, an interior designer, has also done some work for Karen and her husband and she has "found Karen to be … humble … considerate, fiscally responsible, honest, and a pleasure to do business with." Like the others, Amy sees Karen as compassionate, generous and a "fair human being" whose conduct does "not fit the character of the person [she] know[s]."

## IV.    THE SENTENCING CALCULATION

### A. The Guideline Range

On August 20, 2015, Karen pled guilty to conspiracy to commit federal program bribery, in violation of 18 U.S.C §371. While Karen's potential sentence is capped at the statutory maximum term of imprisonment of 60 months, her advisory guideline range is 108-135 months'

imprisonment. Karen's advisory guideline range is based on a total offense level of 31 and a criminal history Category of I. This calculation depends on a base offense level of 12, plus a number of enhancements: 16 points because the amount of the loss was more than $1,500,000 but less than $3,500,000; two points because the offense involved more than one bribe; four points because the offense involved a public official in a high-level decision-making position; and a decrease of three points because Karen clearly demonstrated acceptance of responsibility for the offense and timely notified the government of her intention to plead guilty. (PSR ¶¶31-48). In any event, the starting point for determining Karen's sentence is 60 months, which the Probation Officer has already determined is greater than necessary to achieve the sentencing goals. (Sentencing Rec. at 3).

### B. The Section 3553(a) Factors

The plea agreement allows Karen to ask for any sentence that is permissible under 18 U.S.C. §3553(a). In determining a reasonable sentence under the facts of each individual case, the sentencing court must look beyond the advisory guidelines to the factors set forth in 18 U.SC. § 3553(a). *See United States* v. *Dean,* 414 F.3d 725, 729 (7th Cir. 2005) ("Section 3553(a), unlike the Guidelines themselves after *Booker,* is mandatory."). The Supreme Court has described that statute's parsimony provision—the instruction to "impose a sentence sufficient, but not greater than necessary," to accomplish the purposes of sentencing—as its "overarching" command. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Those purposes include the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public, and to provide the defendant with needed training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a) (2) (A)-(D). The statute also directs courts to consider, among other things, "the nature and circumstances of the offense and the

history and characteristics of the defendant," "the kinds of sentences available," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* at §§ 3553(a) (1), (3), (6). "District courts enjoy broad discretion to fashion an appropriate, individualized sentence in light of the factors in 18 U.S.C. § 3553(a)." *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015). Although the Court must make a finding regarding the correct Guidelines range, it "must not presume that a within-Guidelines sentence is reasonable," *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011), or that a below-Guidelines sentence is unreasonable, *United States v. Jordan,* 435 F.3d 693, 698 (7th Cir. 2006). Further, and relevant to this case, as the Supreme Court has made clear, no "extraordinary circumstances" are required to support a variance from the advisory Guidelines range or to justify a sentence of probation. *Gall v. United States*, 552 U.S. 38, 47 (2007). Rather, in all cases, the sentencing court "must make an individualized assessment based on the facts presented" to determine a sentence sufficient, but not greater than necessary; the Guidelines calculation is but one input. *Id.* at 50; *United States v. Young*, 590 F.3d 467, 474 (7th Cir. 2010) (*quoting, United States v. Dean* 414 F.3d 725, 730-31 (7th. Cir. 2005) (sentencing judge has discretion to sentence below the guidelines "under the new regime in which the guidelines, being advisory, can be trumped" by the other sentencing factors under 18 U.S.C. § 3553(a)).

### 1. Karen's Personal History and Characteristics Support a Sentence of Not Greater Than 14 months

Karen's many positive traits are important considerations that the Court can consider in determining her ultimate punishment. Under 18 U.S.C. §3553(a), the Court may entertain a broad analysis and rely on considerations the guidelines disallow. *Pepper v. United States*, 562 U.S. 476 (2011) (there are no limitations on the background and character information that the sentencing court may consider in determining a defendant's sentence); *United States v. Perez-*

*Molina*, 627 F.2d 1049, 1051 (7th Cir. 2010); *United States v. Booker*, 612 F.3d 596, 603 (7th Cir. 2010). As Judge Rakoff from the Southern District of New York observed, "[i]f ever a man is to receive credit for the good he has done, and his immediate conduct accessed in the context of his overall life hereto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006).

Karen's letters provide a true and accurate portrayal of the woman beyond the criminal conduct that brought her before this Court. The letters reveal that Karen's conduct in this case stands in stark contrast to an otherwise praiseworthy life. The letters show that Karen is not a greedy, selfish, or materialistic person. Rather, they reveal that Karen is a kind, generous, and compassionate person and that hard work, family, and the love of animals (especially dogs) are the core of her life. Importantly, the letters confirm that Karen fully appreciates the gravity of her conduct, that her remorse is genuine, and that she has more to offer her family and the community. All of which are important considerations under 18 U.S.C. §3553(a) and support, whether taken alone or in consideration with the other mitigating factors discussed in this memorandum, a sentence not more than 14 months.

### 2. Karen's Extensive Cooperation Supports a Sentence Not More Than 14 Months

Likewise, Karen's extraordinary cooperation with the Government in this case, the Ohio case, and with the Australian Federal Police, reflect her sincere remorse and desire to make amends for her conduct and should be considered in mitigation. *United States v. Fernandez,* 443 F.3d 19, 26 (2nd. Cir. 2006) (defendant's cooperation can be considered as a measure of his remorse and contrition, important considerations under 18 U.S.C. §3553(a)(1)). Like co-defendant, Martin O'Malley, whose cooperation the Government characterized as "extraordinary," Karen implicated herself in a crime, and fully cooperated up to and during Bills'

trial, at which she testified credibly about her own conduct and Bills' conduct. (Government's Sentencing Memorandum for O'Malley at 11). Further, as reported in the PSR, both the government and the investigating case agent, reported that Ms. Finley was cooperative in this case and other cases and that she "made no attempt to deny or minimize her involvement in the offense." (PSR ¶30). Notably, Karen's cooperation continued even after the trial and beyond that of O'Malley, in that she, at the government's request, met with the Australian Federal Police for 2 days, during which she reviewed her written statement, explained important documents, and went over her testimony at the Bills' trial. Finally, there is no question that Karen's credible testimony was essential to the government securing a guilty verdict against Bills.

At O'Malley's sentencing, the Government urged the Court to balance his "subsequent and extensive cooperation" against his criminal conduct and sentence him to a sentence well-below the guidelines. We ask the Court for this same important consideration in "settling on a reasonable sentence." Karen's substantial cooperation should be encouraged and strongly supports, along with other factors described in this memorandum, a reasonable sentence not more than 14 months.

### 3. The Unique Nature and Circumstances of the Offense Support a Sentence Not More Than 14 Months.

Karen acted illegally and there is no doubt that Karen willingly participated in a serious offense. Karen understands that her conduct financially benefitted Redflex to the detriment of the public's trust in their government. The facts and circumstances of the offense are not presented to justify or minimize the offense, but to aid the Court in assessing Karen's culpability at the time she began participating in the offense. An assessment of the individual facts of this case further provides the Court with an understanding of how this otherwise decent, hard-working woman, with no criminal history got involved in a bribery scheme. Such an assessment

is permitted and relevant under the statutory sentencing factors. *United States v. Vrdolyak*, 593 F.3d 676, 685 (2010) (Hamilton, J., dissenting) (recognizing that defendant's intent not to harm the victim is not inconsistent with defendant's guilt and that defendant's intent can be taken into consideration under §3553(a)). Notably, the unique factors of this case differentiate Karen from other bribery defendants, including her co-defendants and other Redflex employees that were not charged. Finally, Karen's advisory guidelines fail to consider the origins of Karen's involvement in the case and numerous mitigating factors.

Prior to her job at Redflex, Karen had an unblemished 20-year career in the insurance industry, working her way up from clerk to Director of Operations, earning her college degree along the way at age 39. Karen began working at Redflex with good and honest intentions and there is no evidence that she intended to commit a crime. Rather, the evidence suggests that Karen's crime was one of opportunity and a direct result of her employment at Redflex. Bills masterminded the offense, solicited kickbacks from Higgins and Rosenberg (not Karen) and devised a plan with O'Malley to get the illegal payments from Redflex. (Government's Sentencing Submission for O'Malley at 11).

While Karen willingly participated in the offense, her boss (not charged) and the Vice President of Sales (immunized) initiated her into the offense. Karen's co-workers confirm that Karen would not have committed this crime on her own. For example, Jennifer Dwiggens, who worked at Redflex from 2003 until 2015, told the Court "I don't believe that she [Karen] started working at Redflex with the intent on breaking the law. I also know that she was not the person who originated the conduct in this case. Karen was always someone who had high integrity. I am certain that her conduct in this case does not reflect her true character. I am also certain that Karen's conduct is not the product of greed or a desire to hurt anyone." (Exhibit 7). Likewise,

Sandra Stevens, the office manager who worked with Karen from 1998 until 2013, believes that the "tough senior management team" that Karen worked with, rather than greed or desire, contributed to Karen's involvement in the offense. (Exhibit 6). Looking back, Karen believes her involvement was based on a combination of factors, including a "misguided sense of loyalty to Redflex, a fear of losing [her] job and having to look for new work, and an unfortunate desire to fit in." Notably, unlike Bills and O'Malley, Karen did not directly benefit from her criminal conduct. Karen received a salary from Redflex, but her salary and bonuses did not vary due to her participation in the offense. O'Malley collected an inflated salary for a job that was created for him, while Karen worked hard for every penny of hers. (See, Government's Sentencing Submission for O'Malley at 1) ("In addition to his role as the middleman O'Malley profited handsomely from the scheme, pocketing hundreds of thousands of dollars.").

Karen knows none of this excuses her unlawful conduct, but it does distinguish her from the typical fraudster (Bills) whose intent from the beginning is to commit a fraud. And, as the Government agrees regarding O'Malley, it should be considered under 18 U.S.C. §3553(a) in mitigation at sentencing. (See, Government's Sentencing Submission for O'Malley at 11) ("While O'Malley went along and certainly profited from the scheme, he did not concoct this scheme. O'Malley instead was in a difficult financial position at the time Bills proposed his idea, and O'Malley seized that criminal opportunity when it presented itself."). *See also*, *United States v. Milne*, 384 F.Supp 2d 1309, 1310-11 (E.D. Wis. 2005) (sentencing defendant below the advisory guidelines range where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, but to keep his sinking business afloat."); *United States v. Ranum*, 353 F.Supp 2d 984, 990 (E.D. Wis. 2005) (Court considered it mitigating that bank fraud defendant was not motivated by limited personal financial gain); *United States v. Forchette*, 220

F. Supp 2d 914, 925 (E.D. Wis. 2002) (a defendant's "intent in involving himself in the scheme" that is different from the typical intent of a fraud defendant may be considered).

### 4. Specific Deterrence Is Not an Issue in This Case

Karen's cooperation, early acceptance of responsibility, willingness to plead guilty, lack of a prior criminal history, education, family history, and lack of history of drug or alcohol abuse demonstrate that there is no need for specific deterrence. Karen's character letters conclusively demonstrate that her remorse is genuine and that she is unlikely to commit future misconduct or be a danger to the public. The probation officer agrees, noting that Karen lacks a criminal history and has a "relatively small likelihood of recidivism." (Sentencing Rec. at 3).

### 5. General Deterrence

Under 18 U.S.C 3553(a)(2)(B), the Court must also consider general deterrence. We are mindful that general deterrence is a significant factor in white collar criminal cases, but it is not the only factor that the Court must consider. *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014) (recognizing that sentencing judges "should consider general deterrence but must also hand down an 'individualized sentence.') (Quoting *Gall,* 522 U.S. at 50); see also *United States v. Brubaker*, 663 F.2d 764,769 (7th Cir. 1981) ("Consideration of general deterrence is proper provided it does not result in a mechanistic imposition of a sentence."). Indeed, while the effective deterrence of crimes may generally require "a credible threat of imprisonment," that objective "does not necessitate imprisonment in every case." *Warner,* 792 F.3d at 861. And, even a relatively short sentence can promote general deterrence on a prospective defendant. *Adelson*, 444 F. Supp. 2d at 506 (Court deviated from life sentence guidelines for securities fraud defendant and imposed a sentence of 42 months' imprisonment finding that considerable evidence existed that relatively short sentences can promote deterrence in white collar cases);

*United States v. Wachowiak*, 496 F.3d 744, 747 (7th Cir. 2007) (substantial deviation from guidelines appropriate in child pornography case given the collateral consequences suffered by the defendant as a result of the conviction including the loss of his career as a music teacher and his forced resignation from numerous other jobs). See also, *United States v. Nesbeth,* No. 15-CR-18 (E.D.N.Y. May 25, 2016) (drug defendant sentenced to probation despite guideline range of 33-41 months' incarceration based in part on the collateral consequences defendant faced as a convicted felon).

Karen's very public journey through the criminal justice system will serve as a cautionary tale to others similarly situated to her.[4]  There is no doubt that similarly situated defendants will likely be deterred from engaging in illegal conduct by the negative business, financial, personal, emotional, and family consequences resulting from even a relatively shorter jail sentence. *Warner*, 792 F.3d at 860-61.  Even though it was by her own doing, Karen paid gravely for her conduct and this case will have lifelong effects on her and her family.  Karen destroyed her professional career and the good reputation that it took her a lifetime to build.  Since she pled guilty, Karen has been unable to find a job, even losing her job at a bakery.  When Karen gets out of jail, she will enter the job market as an almost 60-year-old convicted felon, certainly not a prime prospect for any employer.  Given their dire financial future, Karen and Tim will likely lose their home and other assets legally earned.  Karen is also on the hook for the $2,032,959.50 paid to O'Malley and funneled to Bill, despite not having directly benefitted from this money like them.  Finally, and most difficult for Karen, is that a jail sentence will take her away from her 85-year-old father who suffers from dementia and other serious health issues.  Karen is very

---

[4] Collateral consequences include restrictions on employment, travel, housing, banking, voting, employment and benefits.  *See Nesbeth*, 15-CR-18 ("Remarkably, there are nationwide nearly 50,000 federal and state statutes regulations that impose penalties, disabilities, or disadvantages on convicted felons").

worried that he will not understand her absence and that he will die while she is incarcerated. In addition, it is well established in this Circuit that a period of supervised release following a custodial sentence is not just an "add on" but that it also serves the objectives of general deterrence and rehabilitation. *United States v. Kappes,* 782 F.3d 828, 836 (7th Cir. 2015) (well-tailored supervised release conditions "serve the purposes of deterrence, rehabilitation and protection of the public."). Thus, a sentence of no greater than 14 months' imprisonment followed by one year of supervised release, would more than adequately punish Karen, reflect the seriousness of this offense, and promote specific and general deterrence. The conditions of supervised release are discussed below.

**6. A Sentence of Not More Than 14 Months Is Consistent With Karen's Role In The Offense, Is Appropriate In Light Of Her Co-Defendants' Sentences And Would Avoid Unwarranted Sentencing Disparities With Similarly Situated Defendants**

The Court's prior sentences in this matter further support the conclusion that a sentence of no more than 14 months' incarceration and one year of supervised release for Karen is an appropriate sentence under 18 U.S.C. §3553(a). In addition, under 18 U.S.C. §3556(a)(6), district courts must seek to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

**a. John Bills**

Bills faced an advisory guideline range of 292-365 months. This Court sentenced Bills to 120 months, less than half of the advisory guideline range, on the low end. Although 120 months is a steep sentence, Bills received a significant deviation from the guidelines range despite aggravating factors that are not present in Karen's case. First, Bills was a public employee, Karen was not. Second, Bills was the architect of the scheme. In contrast, Karen did not plan or initiate the scheme and only joined through her employment. Third, Bills recruited

22

O'Malley into the scheme. Karen did not recruit anyone into the scheme. Fourth, Bills acted out of greed and profited handsomely, while Karen never personally benefitted. Fifth, Bills has never accepted responsibility for his conduct, continuing to publicly minimize and blame others for what he did even after a conviction. Karen did exactly the opposite, fully accepting responsibility for her conduct, both in open court and privately with friends and family. Finally, Karen cooperated extensively with the government. Given Karen's extraordinary cooperation and her relative culpability, Karen should get a sentence no greater than 14 months, which would represent a deviation from the advisory guidelines that is on par or less than the deviation Bills received.

      **b. Martin O'Malley**

      At O'Malley's sentencing, the government called for leniency for O'Malley, asking for a sentence of home detention, despite a guideline range of 60 months (the same as Karen). This Court sentenced O'Malley to six months in jail, which was about a 90% deviation from the guidelines. Like O'Malley, Karen admitted her guilt, did not minimize her conduct, cooperated with the government, and provided credible testimony at Bills' trial, netting the government a conviction. Similarly, just as Bills recruited O'Malley into the offense by taking advantage of his vulnerability, so too did Redflex (Higgins and Rosenberg) "recruit" Finley into the bribery scheme. Both Karen and O'Malley willingly participated, but both joined the scheme only after being solicited by others and not for greed. While Karen was the CEO of Redflex, O'Malley's involvement in the scheme was in many ways more extensive, or at least as extensive as Karen's involvement in the scheme. O'Malley and Bills planned an elaborate scheme to funnel money from O'Malley to Bills, involving speaking in code, the "structuring" of kickbacks in amounts below $10,000, and the staging of O'Malley family photos around the Arizona condominium to

conceal the illegal gains. All which O'Malley profited from. Karen should get the same consideration as O'Malley and we ask for a sentence of no more than 14 months. This sentence considers the mitigating factors the government found important for O'Malley, satisfies general deterrence, and recognizes the Government's contention that O'Malley served an inferior role in the offense in comparison to Karen because she was the CEO.

### c.   Other Cases

The case of *United States v. Oropesa*, No. 16-CR-71 (N.D. Ga. 2016), is also instructive in determining a reasonable sentence for Karen. In *Oropesa*, the Court sentenced the defendant, a former executive for the company that runs Chicago parking meters, to six months' home confinement, despite a guideline range of 15-20 months. The defendant pled guilty to taking $90,000 in bribes in exchange for steering a $20 million contract to install the privately-owned meters to a company based in Tampa, Florida. Oropesa's conduct was more egregious and widespread than Karen's in that he took $90,000 in bribes, set up a fake company to hide the kickbacks, and recruited others into the offense.

In September 2016, a Virginia federal judge sentenced the CEO of Virginia Regional Transit to 18 months in prison for federal program bribery. *United States v. McGregor*, No. 16-113 (E.D. VA). The CEO faced a guideline range of 63-78 months. The CEO took bribes in exchange for his approval of false labor invoices by an automotive repair company doing business with the transit company. Unlike this CEO, Karen was not a public official, did not take kickbacks, and did not otherwise profit from the bribery scheme. The above cases involving more culpable defendants indicate that a sentence far less than the advisory guidelines can reflect the seriousness of Karen's offense and provide "just punishment" for her conduct.

24

On the flipside, warranted disparities are permitted.  *United States v. Pape*, 601 F.3d at 743, 750 (7th Cir. 2010).  The advisory sentencing regime mandates that the Court judge each defendant on an individual basis and that such differences can justify a sentencing disparity. *United States v. Turner*, 604 F.3d 381, 389 (7th Cir. 2010).   The unique personal characteristics and the facts surrounding Karen's offense conduct distinguish Karen from her co-defendants and the typical bribery defendant.  *United States v. Pulley*, 601 F.3d 660, 669 (7th Cir. 2010) (*C.f.* the district court is entitled to consider an individual defendant's guilty plea, lack of criminal history, history and circumstances of the offense, and rehabilitation in sentencing co-defendants to different sentences).

## V.   CONDITIONS OF SUPERVISED RELEASE

### A. Mandatory

Given that these conditions are mandated by statute, Karen does not object to the conditions recommended by the probation officer.

### B. Discretionary

Karen does not generally object to conditions 2,4,6, 8, 14, 15, 16, 17, and 18, as numbered in the PSR. (Pages 22-24). [5]  Karen objects to condition 9 requiring her to participate in a substance abuse treatment program since Karen has no history of substance abuse, (PSR ¶¶75-76), and this condition is not reasonably related to the factors set forth in 18 U.S.C.

---

[5] Karen agrees with the Government's proposal in the Bills' case to re-word discretionary condition #4 so that the phrase "seek, and work conscientiously at lawful employment" instead reads "seek and work conscientiously at obtaining lawful employment."  (See, *U.S. v. Bills*, No. 14-135-1, DKT 222, Government's Sentencing Memorandum at 21).

§3553(a).[6]   The district court suspended the drug testing condition in the Ohio case based on the Court's determination that Karen posed a low risk of future substance abuse.

### C.  Special Conditions

Karen does not object to conditions 3,5,6,7, 8,10, and 11.  Karen objects to condition 14 requiring her to submit her "person, property, house, residence, vehicle, papers, computers …, other electronic communications or data storage devices or media, or officer, to a search conducted by a probation officer."  This condition is not reasonably related to the §3553 factors and involves a greater deprivation of liberty than is necessary in this case.

## VI.    Conclusion

Karen takes full responsibility for her conduct and feels terribly sorry that her actions directly contributed to a serious abuse of the public trust.  She will never be before this Court again, but accepts that a jail sentence is the only sentence that will send the right message to deter others.  She hopes for a sentence tempered with mercy that will allow her to continue caring for her elderly father and begin the difficult task of restarting her life.  We ask the Court to balance Karen's extraordinary cooperation, acceptance of responsibility, excellent character, the unique nature and circumstances of her offense, and the collateral consequences suffered by Karen and her family, against her conduct in this case and sentence her to no more than 14 months, to be followed by one year of supervised release.  Such a sentence is "sufficient but not greater than necessary" to achieve the sentencing goals and considers all the above factors.

---

[6] In the Sentencing Recommendation at page 5, condition 9 requires participation in mental health treatment, not substance abuse treatment as indicated in the PSR.  Karen objects to mental health treatment as it is not indicated in this case.

Respectfully submitted,
Karen Finley


By: /s/Jacqueline S. Jacobson
    One of her attorneys

Dated:  October 27, 2016

Michael D. Monico
Jacqueline S. Jacobson
Monico & Spevack
20 South Clark Street, Suite 700
Chicago, Illinois 60603
312-782-8500