UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KAREN FINLEY | 14 CR 135-3<br><br>Honorable Virginia Kendall |

## GOVERNMENT'S SENTENCING MEMORANDUM

**I.   Introduction**

Defendant Karen Finley served a vital role in the charged conspiracy. As a senior executive of a company that chose to compete for City business in Chicago, Finley and others at Redflex chose to play dirty. For over eight years, they worked to ensure that City official John Bills and his bagman, Martin O'Malley, received compensation and other lucrative benefits from Redflex in exchange for Bills's official assistance in securing and keeping the City's red light camera contract. In participating in this corrupt arrangement, Finley deprived Redflex's competitors of a fair shake, helped Bills violate the public trust, and hurt the City both financially and by contributing to the public's delusion and cynicism about Chicago city government. However, Finley decided to cooperate with the government. She was truthful and fully recounted to government agents the events, conversations, and correspondence that were part of the scheme and in which she participated. Finley testified against her co-conspirator and the leader of the conspiracy, John Bills. In doing so and in her Defendant's Version, she has fully acknowledged and taken responsibility for her role in the scheme, and she has demonstrated sincere remorse and regret for her conduct.

**II.   Factual Objections to the PSR**

None

**III.     Advisory Custody Guidelines Range**

Finley entered a negotiated plea of guilty to Count Fourteen of the indictment, charging her with conspiracy, in violation Title 18, United States Code, Section 371, to commit federal program bribery, prohibited by Title 18, United States Code, Section 666(a)(2). (R.85).

    A.     <u>Base Offense Level, Chapter Two Specific Offense Characteristics, and Chapter Three Reductions</u>

Pursuant to Guideline § 2C1.1(a)(1), Finley's base offense level is 12. (PSR, at ¶¶32-33). Pursuant to Guideline § 2C1.1(b)(1), because the offense involved more than one bribe, the offense level is increased by 2 levels. (PSR, at ¶34).

Pursuant to Guideline § 2C1.1(b)(2), because the loss exceeded $6,500, the offense level is increased by the number of levels from the table in § 2B1.1. Here, Finley's base offense level should be increased by 16 levels because the loss, as measured by the $2,032,959.50 that Redflex paid to O'Malley (a portion of which O'Malley gave to Bills in cash kickbacks, third-party checks, and the purchase and expenses related to the Arizona condo), was more than $1,500,000 but less than $3,500,000. (PSR, at ¶¶35-36).

Pursuant to Guideline § 2C1.1(b)(3), defendant's offense level is increased by four levels because the offense involved a public official in a high-level decision-making or sensitive position. (PSR, at ¶¶37-38).

Under Guidelines § 3E1.1, Finley has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct. A two-level reduction in the offense level is appropriate. (PSR, at ¶44). In accord with Guideline § 3E1.1(b), Finley also timely notified the government of her intention to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as

provided by Guideline § 3E1.1(b), defendant is entitled to an additional one-level reduction in his offense level. (PSR, at ¶45).

    B.    <u>Criminal History</u>

In paragraph 13 of Finley's plea agreement, the government and defendant agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that if Finley's sentencing in *United States v. Karen Finley*, case number 2:15 CR 148, filed in the Southern District of Ohio, takes place prior to the sentencing in this matter, a downward departure, pursuant to guideline § 4A1.3(b)(1), to Criminal History Category I is warranted. In fact, on October 19, 2016, Finley was sentenced in the Ohio case to 14 months imprisonment, and so, consistent with paragraph 13 of the plea agreement, the government maintains that adding points for the sentence imposed in case number 2:15 CR 148 would substantially over-represent the seriousness of defendant's criminal history, as case number 2:15 CR 148 involves unrelated but similar conduct that occurred during a similar time frame as the conduct in this matter and that could have been joined with this matter for contemporaneous resolution, which would have resulted in no additional criminal history points. If the downward departure is granted by the Court, Finley's criminal history points equal zero, which places her in criminal history category I. (The PSR, at ¶53, puts the criminal history points as one, since the PSR was written prior to Finley's sentencing in Ohio, and without the downward departure, Finley's Ohio conviction that was awaiting sentencing would be given one point, pursuant to guideline § 4A1.2(a)(4). After sentencing, which is where the Ohio matter now stands, three points would be given, pursuant to § 4A1.1(a), unless the Court grants the downward departure.)

    C.    <u>Advisory Guidelines Range</u>

Finley's total offense level is 31, which, when combined with a criminal history category of I, results in an advisory sentencing guidelines range of 108 to 135 months' imprisonment, in

3

addition to any supervised release and fine the Court may impose. Pursuant to Guidelines § 5G1.1(a), because the statutory maximum sentence on the count to which Finley pled guilty is five years' imprisonment, which is less than the minimum of the applicable guideline range, five years becomes the advisory custody Guidelines range. Further, the advisory fine range for the offense of conviction, pursuant to Guidelines §§ 5E1.2(c)(3) and 5E1.2(h)(1), is from $15,000 to $150,000.

**IV.    Restitution**

The Mandatory Victims Restitution Act ("MVRA") provides that restitution will be ordered to any victim for "an offense against property under this title, including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA defines a victim as any person directly harmed by a defendant's criminal conduct in the course of a scheme, *United States v. Belk*, 435 F.3d 817, 820 (7th Cir. 2006); 18 U.S.C. § 3663A(a)(2), which may include a government agency, *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998). The City of Chicago is victim of the honest services and bribery offenses here. It contracted to pay Redflex over $120 million dollars in relation to the red light camera enforcement contracts that Bills corruptly steered to Redflex. By doing so, the City of Chicago was "directly and proximately harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

The proper amount of restitution owed to the City of Chicago is the amount wrongfully taken by the defendant as a participant in the scheme. 18 U.S.C. § 3663A(b)(1)(B). Restitution under the MVRA is limited to situations the victim could have obtained under a civil suit. *United States v. Martin*, 195 F.3d 961, 968 (7th Cir. 1999) (providing that the MVRA "seeks to engraft a civil remedy onto a criminal statute, giving the victim of the crime the recovery to which he would have been entitled in a civil suit against the criminal and thus merely providing a procedural

shortcut rather than imposing a heavier criminal punishment"). The government bears the burden of proof to establish the restitution amount by a preponderance of the evidence, but the defendant bears the burden to demonstrate the financial resources of the defendant and the financial needs of her dependents. 18 U.S.C. § 3664(e).

In *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569 (2004), a commercial bribery case, the Seventh Circuit explained that the quantum of bribes paid "can be used as a minimum estimate of damages . . . on the theory that no one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to the amount of the bribe; and that additional revenue is, at least as a first approximation, an additional expense to the person whose agent was bribed." *Id.* at 576. There, Williams, a video games manufacturer, brought fraud claims against its suppliers, one of which was Arrow, charging them with having bribed one of Williams's buyers, Greg Barry. *Id.* at 572. James Garrity worked for Arrow, and passed the bribes on to Barry. *Id.* at 575. The jury returned a verdict in favor of Williams in the amount of $78,000, "the amount of the bribes that Garrity paid." *Id.*

In addressing that award, the Seventh Circuit reasoned that Arrow, the bribe payor, "presumably jacked up its prices . . . to cover the cost of the bribes that it was paying . . . to swing business its way, as otherwise it would have lost rather than made money from brib[ery]." *Id.* at 576. Had it not been for the bribes, therefore, Arrow's prices to Williams would have been at least $78,000 lower "[s]o that amount is the minimum estimate of the loss to Williams caused by Arrow's bribing Barry." *Id.*

The Seventh Circuit's reasoning in *Williams Elec. Games* applies with equal force here. Redflex hired O'Malley as the conduit through which it would funnel money to Bills, and it paid O'Malley over $2 million in compensation. Just as Arrow did in *Williams Elec. Games*, Redflex

5

"presumably jacked up its prices to [the City of Chicago] by at least [$2 million] to cover the cost of the bribes that it was paying [Bills through O'Malley] to swing business its way, as otherwise it would have lost rather than made money from bribing him." In this way, the $2 million that Redflex paid to O'Malley as the bribe conduit to Bills represents a loss to the City of Chicago, specifically money that it would not have otherwise paid out to Redflex absent the scheme to defraud and bribery conspiracy.[1] The entire amount paid to O'Malley (as opposed to the amount specifically passed on to Bills) better captures Chicago's loss because, as Finley testified at trial, Redflex only hired O'Malley to keep Bills and Chicago happy, rendering the entire amount paid to O'Malley part of the scheme to defraud and bribery conspiracy.

As the evidence demonstrated at trial, Redflex paid O'Malley approximately 2,032,959.50.[2] The amount of money Redflex paid to O'Malley in the course of the scheme/conspiracy represents an overcharge or expense incurred by the City of Chicago, and therefore, a loss it is entitled to recoup through restitution.

Under the MVRA, upon determination of the amount of restitution owed to the victim, the Court shall consider in setting the schedule of payment (1) the financial resources and other assets of the defendant, (2) projected earnings of the defendant and (3) any financial obligations of the

---

[1] Other courts have approved of this theory of restitution in bribery cases. *See e.g., United States v. McNair*, 605 F.3d 1152, 1221 (11th Cir. 2010) (providing that the "district court did not clearly err in finding that the contractors essentially recouped their bribe money by adding it back to their sewer and engineering contract bills as a cost of doing business with the County" and affirming the restitution figure of $851,927 based on the "goods, services, labor materials, and money [defendant received] as a result of the bribery scheme"); *United States v. Gaytan*, 342 F.3d 1010, 1012 (9th Cir. 2003) ("Gaytan accepted $61,506.63 in bribe money. So long as Gaytan retains those funds, the City of Colton suffers a loss in that amount. The district court properly ordered Gaytan to pay restitution to the City.").

[2] This amount is based on the total amount of money paid to O'Malley from Redflex (both biweekly compensation and commissions), as reflected in "Government Exhibit 303_MOM Redflex Checks," which the government introduced at trial.

defendant. 18 U.S.C. § 3664(f)(2). "A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." 18 U.S.C. § 3664(f)(3)(A). Section 3664 also directs the Court to craft its restitution order pursuant to 18 U.S.C. § 3572, *id.* § 3664(f)(2), which provides that "[a] person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments." 18 U.S.C. § 3572(d)(i)(emphasis added).

According to the PSR, Finley has the financial resources to make a significant lump sum payment immediately towards restitution. Based on Finley's financial situation as detailed in the PSR, the government requests that the Court order Finley to make a one-time lump sum payment of $50,000 towards restitution, to be paid within 30 days of sentencing. This payment, while significant, still leaves Finley with reasonable resources to support herself during a term of supervised release based on additional funds in her bank accounts and other assets that she holds.

**V.     Title 18, United States Code, Section 3553(A) Factors**

     A.     <u>Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))</u>

John Bills was the architect of the kickback scheme that lined his pockets, and in order to make it work, he recruited O'Malley as his bagman. Early co-conspirators in the scheme were Aaron Rosenberg, the Redflex Vice President of Sales, and Bruce Higgins, the CEO of Redflex when the scheme began in about 2003. While Karen Finley was not one of the primary designers of the scheme, she joined it willingly and made it possible for the scheme to continue for over eight years. On the other hand, Finley ultimately cooperated with law enforcement and testified in the trial of Bills. Finley's criminal conduct and role in the scheme must be balanced against her subsequent cooperation.

1. *What Finley Did*

Finley began her involvement in the kickback scheme when she went along with the hiring of O'Malley as a Redflex customer service representative, well knowing that O'Malley was not qualified for the job. As the Redflex Vice President of Operations, Finley followed Higgins's lead when she agreed that O'Malley would be hired because he was a friend of Bills, who had just steered the Chicago red light camera contract to Redflex, and it was important to keep Bills happy in order to ensure his continued assistance. At Higgins's direction, Finley signed O'Malley's employment contract, which contained provisions, unusual for a customer service liaison, that allowed for lucrative increases in O'Malley's compensation as new red light cameras were added.

As the years went on and Finley became CEO of Redflex in 2005, she was fully aware that O'Malley's compensation was exorbitant, but she willfully avoided learning whether O'Malley was passing any of the compensation to Bills. Finley suspected that Bills was receiving money from O'Malley and she even questioned Rosenberg about her suspicions, but when she received conflicting answers from Rosenberg, she decided not to further press the issue because she wanted to avoid direct knowledge of bribes or kickbacks. In 2007, when Rosenberg told Finley to hold off paying a bonus to O'Malley until Rosenberg spoke to Bills about it, Finley complied, never questioning why Bills would need to be consulted about O'Malley's bonus. By the time Redflex's comptroller encouraged Finley to reassess or renegotiate the commission provisions in O'Malley's contract, Finley had come to the understanding that Bills was benefiting from O'Malley's salary, but she refused to revisit O'Malley's commission provisions because she did not want to make Bills unhappy and jeopardize Redflex's Chicago contract and any expansions of that contract. In 2010, a former Redflex employee sent a letter to the Redflex Board of Directors which contained an allegation that O'Malley was passing money to Bills, and the letter gave rise to an internal

investigation that concluded merely that Redflex had just, on one occasion, paid for a hotel room for Bills. Finley knew that this conclusion was wrong; she herself had approved other benefits given to Bills by Redflex with the intent to influence and reward Bills in connection with the Chicago red light camera contracts. Yet, she remained silent and did not set the record straight. Further, when the Chairman of the Board of Redflex's parent company noted to Finley that O'Malley's salary was quite high, Finley defended the salary amount, despite her understanding at that point that O'Malley was passing money to Bills.

During the course of the scheme, Finley was fully aware of the official acts that Bills took in favor of Redflex as he was receiving benefits from Redflex, such as hotel stays, rental cars, dinners and golf outings, and as he was receiving money from O'Malley, as Finley came to understand. Among the acts that Bills performed to help Redflex was giving assistance and inside information to Redflex, including passing to Redflex through O'Malley drafts of the RFP that the City was to issue in 2007 for the second red light camera contract. As Finley e-mailed to Rosenberg her comments regarding the draft RFP, she advised Rosenberg to delete the e-mails so as to cover up the collusion between Redflex and Bills.

Despite her knowledge of the benefits that Redflex had given to Bills directly, such as hotel stays, rental cars and golf outings, and despite her realization that part of O'Malley's compensation was being passed on to Bills, in August 2007 and September 2008, Finley falsely certified on Economic Disclosure Statements submitted to the City of Chicago that no agents of Redflex, during the prior five years, had bribed or attempted to bribe an employee of the City of Chicago.

    2.    *Finley's Role in the Conspiracy*

Finley was a willing participant in the charged conspiracy. As a high-level executive at Redflex, and certainly once she became CEO, she could have put a stop to Redflex's showering

Bills with personal benefits in exchange for his continued support. Further, she could have done her job honestly and confronted her suspicions, which later became her understanding, that the exorbitant commissions paid to O'Malley were making their way to Bills. Because of the power of her position, and her failure to use that position to eliminate the corruption that was taking place, Finley played a more integral role in the conspiracy than O'Malley, the bagman, who agreed to Bills's offer to participate in the conspiracy when he was in desperate financial straits. While Finley did not directly benefit from the conspiracy, she received indirect financial benefit because her salary and bonuses were based on the success of Redflex's U.S. operations, and that success was driven in large part by the healthy profits obtained through the Chicago contracts, whose size constituted a major percentage of Redflex's business in the United States. Of course, Finley's role was certainly inferior to that of Bills, the architect of the conspiracy, who betrayed his fiduciary duty to the citizens of Chicago and brazenly lined his pockets with kickbacks.

3.  *Finley's Cooperation and Government's Sentencing Recommendation*

After Finley decided to cooperate, she spent time reconstructing the timeline of events, refreshed her memory regarding e-mails and documents, and gave truthful information and testimony. Finley made herself available to come to Chicago on numerous occasions to review evidence and prepare for her testimony. Her cooperation was extraordinary and resulted in the government entering a plea agreement whereby she would plead only to a conspiracy count.

The government asks the Court to consider that cooperation and recommends that Finley be sentenced to 30 months incarceration. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties, in paragraph 13 of the plea agreement, agreed that the sentence imposed in this matter should run concurrent to the sentence imposed in the Southern District of Ohio in case number 2:15 CR 148.

With regard to a fine, while Finley's financial condition does indicate that she has the ability to pay a fine, the government recommends that Finley's financial payments be focused on making restitution to the victim of the scheme, the City of Chicago.

## VI. Conditions of Supervised Release

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), as well as subsequent Seventh Circuit precedent, and in addition to the imposition of a sentence of a term of imprisonment, the government recommends the imposition of a term of supervised release of three years.

### A. Mandatory conditions

The PSR recommended the following mandatory conditions, specifically that Finley: (1) "not commit another Federal, State, or local crime," (PSR, Mandatory Conditions, #1); (2) "not unlawfully possess a controlled substance," (PSR, Mandatory Conditions, #2); and (3) "cooperate in the collection of a DNA sample if the collection of such a sample is required by law," (PSR, Mandatory Conditions, #5). The government agrees with the imposition of these mandatory conditions. *United States v. Bryant*, 754 F.3d 443, 445 (7th Cir. 2014) (discussing the mandatory condition that a defendant must cooperate in the collection of a DNA sample, and explaining that "[s]ince it was mandatory, no reason needed to be given for its imposition").

### B. Discretionary Conditions

In addition to the mandatory conditions, the Court has discretion to impose additional conditions of supervised release (1) that are "reasonably related" to the factors set forth in 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); (2) that "involve[] no greater deprivation of liberty than is reasonably necessary" to meet the goals of 18 U.S.C. §§ 3553 (a)(2)(B), (a)(2)(C), and (a)(2)(D); and (3) that are "consistent with any pertinent policy statements issued by the

Sentencing Commission." 18 U.S.C. § 3583(d); *United States v. Shannon*, 743 F.3d 496, 500 (7th Cir. 2014). Section 3583(d) points to the discretionary conditions set forth in § 3563(b).

The PSR recommends a number of discretionary conditions, some of which are included in General Order 12-13 of the District of Arizona, where it is expected Finley will serve any term of supervised released. The wording of one of the discretionary conditions, #4, which requires the defendant to "seek, and work conscientiously at, lawful employment or pursue conscientiously a course of study," has been criticized by the Seventh Circuit because, read literally, the condition requires a defendant to work even if she can't find a job. *United States v. Ortiz*, 817 F.3d 553, 555 (7th Cir. 2016). Thus, the government recommends that this condition be reworded to read "seek lawful employment, and if found, work conscientiously at that employment, or pursue a conscientiously a course of study or vocational training that will equip you for employment.

Discretionary conditions 2, 6, and 8, as numbered in the PSR, support defendant's rehabilitation and reintegration into the community. For example, discretionary condition #2 requires Finley to pay restitution, which is mandated under the statute. Repaying her debt to society will assist Finely in her rehabilitation.

Discretionary condition #6 directs defendant to refrain from communicating or meeting with persons she knows to be engaged in criminal activity. The Seventh Circuit has approved of the language similar to that recommended by the probation office here. *See United States v. Kappes*, 782 F.3d 828, 848-49 (7th Cir. 2015) (criticizing different language, specifically the vagueness of the word "associate," and recommending alternative language: "to meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity"). Discretionary condition #8 instructs the defendant to refrain from possessing a firearm, which she may not otherwise now do as she is a felon.

12

Discretionary condition #9 in the PSR is appropriate in this case, as the defendant has stated, in her version of the offense, that she has experienced periods of depression, has sought mental health counseling, and has taken prescription medication for her depression.

Discretionary conditions #14-18 in the PSR all serve a similar purpose, that is, facilitating the supervision of Finley by the probation officer. Requiring Finley to remain within the jurisdiction where she will be supervised and reporting to a probation officer, for example, allow the probation officer to supervise Finley and ensure her success on supervised release. (PSR, Discretionary Conditions, #14 & 15). However, in light of the Seventh Circuit's criticism of the language of discretionary condition #14, *see Ortiz*, 817 F.3d at 555, the government suggests that the wording be changed to "the jurisdiction where you are being supervised, which is expected to be either the Northern District of Illinois or the District of Arizona, to be determined at the time you enter into supervised release." These conditions likewise encourage Finley's compliance with the law and deter her from future crimes by keeping the defendant in contact with her probation officer. Discretionary condition #16 – allowing the probation office to visit defendant at various locations – is "reasonably related to rehabilitation and protecting the public from recidivism since it should allow probation officers to help [Finley] reintegrate into society after [her] time in prison and to ensure that [she] is abiding by the conditions of [her] supervised release." *United States v. Armour*, 804 F.3d 859, 870 (7th Cir. 2015); *see also Johnson v. United States*, 529 U.S. 694, 709 (2000) (describing supervised release as "the decompression stage" between prison and full release and noting that defendants may need help achieving "successful reintegration"). Discretionary conditions 14-18 are reasonably narrow and allow the probation officer to supervise Finley effectively. Effective supervision of Finley by the probation office will assist her in her rehabilitation and ensuring that her term of supervised release is completed successfully.

C.  Special Conditions

Pursuant to 18 U.S.C. § 3563(b)(22), which allows for "other conditions as the court may impose," the probation office recommended numerous additional conditions.

First, the probation office recommended a series of financially-related conditions. Specifically, it recommended that, in case Finley is unemployed after the first 60 days of supervision or for 60 days after termination or lay-off from employment, Finley should perform at least 20 hours of community service per week, not to exceed 200 hours. (PSR, Special Conditions, #3). If the Court imposes this condition, in accordance with the Seventh Circuit's decision in *Ortiz*, the Court should explain why the numbers of hours cited in this condition "creates a proper balance between the benefits and the burdens of community service." *Ortiz*, 817 F.3d at 556.

Second, the probation office recommended that Finley not open any lines of credit without approval, provide access to requested financial information, notify the Court of material changes in her economic circumstances, and provide tax documentation. (PSR, Special Conditions, #5-8). These conditions facilitate defendant's payment of court-ordered restitution thus assisting Finley in meeting the financial obligations imposed by the Court. In the same vein, these conditions assist the probation office in monitoring Finley's ability to meet her financial obligations.

Third, the probation office recommended that Finley pay any financial penalty that remains unpaid at the commencement of supervised release pursuant a payment schedule. (PSR, Special Conditions, #10). This condition, like the financial-related conditions above, assists Finley in meeting her court-ordered obligations.

Fourth, the probation office recommended that defendant "not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court." (PSR, Special Condition, #11). While the government contends that this condition is largely

unnecessary here, as the Seventh Circuit has previously noted, "acting as a confidential informant is generally inconsistent with the rehabilitative and re-integrative goals of supervision." *Kappes*, 782 F.3d at 851 (finding that the district court's lack of findings to support this condition was harmless) (internal quotation and end citation omitted).

Fifth, the probation office recommended that Finley shall submit her person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media or office to a search conducted by a probation officer. (PSR, Special Condition, #14). The government assumes that this is required by General Order 12-13 of the District of Arizona. In the government's view, this condition is unnecessary.

### VII. CONCLUSION

Bribery is a two-way street. Corrupt public officials cannot rob taxpayers without private counterparts willing to feed their corruption. Finley was a senior executive of a company that chose to compete for business in Chicago. Rather than competing fairly, Finley and others at Redflex chose to play dirty. This egregious behavior has contributed to the public's delusion and cynicism about Chicago city government. To her credit, Finley has acknowledged her criminal conduct and cooperated fully with the government, including testifying truthfully at the trial against John Bills.

                                              Respectfully submitted,
                                              ZACHARY T. FARDON
                                              United States Attorney

                                By:    */s/Laurie J. Barsella*
                                              ZACHARY T. FARDON
                                              LAURIE BARSELLA
                                              TIMOTHY J. STORINO
                                              Assistant United States Attorneys
                                              219 South Dearborn Street
                                              Chicago, Illinois 60604
Dated: October 27, 2016                   (312) 353-5300